**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                                      )
INTERCEPT PHARMACEUTICALS, INC.,          )
                                                      )
    Plaintiff and Counterclaim-Defendant,      )
                                                      )
                 v.          )          No.  1:14-cv-01480-AKH
                                                      )
CHRIS HOWARD,                                 )
                                                      )
    Defendant and Counterclaim-Plaintiff,      )
_____ )

**MEMORANDUM OF LAW IN SUPPORT OF INTERCEPT PHARMACEUTICALS,**
**INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS**

## Table of Contents

Page

INTRODUCTION ...................................................................................................................1

SUMMARY OF HOWARD'S ALLEGATIONS ..................................................................2

    I.    The Parties ...............................................................................................2

    II.    The Parties Entered Into Written Agreements Governing The Grant And Exercise of Howard's Stock Options ..........................................................2

        A.    *Howard's Consulting Agreement*.................................................2

        B.    *Howard's Stock Option Agreement* ............................................3

        C.    *Intercept's 2003 Stock Plan*........................................................3

        D.    *The Employment Agreement* .......................................................3

        E.    *The Termination Agreement* .......................................................4

    III.    Howard Failed to Pay The Required Exercise Price to Exercise His Stock Options .....................................................................................................5

ARGUMENT ..........................................................................................................................8

    I.    Legal Standard ........................................................................................8

    II.    Howard's Counterclaim Should be Dismissed For Failure Adequately To Plead The Elements of a Breach of Contract ...........................................8

    III.    Howard's Breach of Contract Claim Is Barred By The Applicable Statute of Limitations ........................................................................................11

    IV.    The Court Should Also Dismiss Howard's Claim For Declaratory Relief ...........14

        A.    *Howard's Claim for Declaratory Relief Is Redundant With His Breach of Contract Claim* ........................................................14

    V.    Howard's Claim For Declaratory Relief Is Barred By Laches .............................16

CONCLUSION .....................................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................................................8

*BCE Emergis Corp. v. Cmty. Health Solutions of Am., Inc.,*
  148 Fed. Appx. 204 (5th Cir. 2005) .........................................................................9

*Clarendon Nat'l Ins. Co. v. Culley,*
  No. 11-2629 (HB), 2012 U.S. Dist. LEXIS 58067 (S.D.N.Y. Apr. 25, 2012) ............11

*DiFolco v. MSNBC Cable LLC,*
  622 F.3d 104 (2d Cir. 2010)......................................................................................7

*Graziano v. Pataki,*
  689 F.3d 110 (2d Cir. 2012) .....................................................................................8

*Harris v. Mills,*
  572 F.3d 66 (2d Cir. 2009) .......................................................................................8

*Hayden v. Paterson,*
  594 F.3d 150 (2d Cir. 2010) .....................................................................................8

*Intercon Solutions, Inc. v. Basel Action Network,*
  969 F. Supp. 2d 1026 (E.D. Ill. 2013) .....................................................................15

*JJCK, LLC v. Project Lifesaver Int'l,*
  No. 10-930-LPS, 2011 U.S. Dist. LEXIS 71367 (D. Del. July 1, 2011).....................15

*Kroeze v. Chloride Group Ltd.,*
  572 F. 2d 1099 (5th Cir. 1978) .................................................................................9

*Manley Toys, Ltd. v. Toys "R" Us, Inc.,*
  No. 12-3072, 2013 U.S. Dist. LEXIS 8369 (D. N.J. Jan. 22, 2013) .............................9

*MedImmune, Inc. v. Genentech, Inc.,*
  549 U.S. 118 (2007) ................................................................................................14

*Muto v. CBS Corp.,*
  668 F.3d 53 (2d Cir. 2012) ......................................................................................11

*Penn Mut. Life Ins. Co. v. Norma Espinosa,*
  No. 09-300-JJF, 2010 U.S. Dist. LEXIS 77334 (D. Del. July 30, 2010)................15

*Phillips v. the Hellenic,*
  179 F.Supp. 5 (S.D.N.Y. 1959)................................................................................16

*Roberts v. Babkiewicz,*
    582 F.3d 418 (2d Cir. 2009) ................................................................8

**STATE CASES**

*Adams v. Jankouskas,*
    452 A.2d 148 (Del. 1982) ................................................................17

*Eluv Holdings (BVI) Ltd. V. Dotomi, LLC,*
    No. 6894–VCP, 2013 WL 1200273 (Del. Ch. Mar. 26, 2013)........................12, 13, 16

*Fanean v. Rite Aid Corp. of Del., Inc.,*
    984 A.2d 812 (Del. Super. Ct. 2009)................................................9

*Price v. E.I. DuPont de Nemours & Co.,*
    26 A.3d 162, 166 (Del. 2011) ................................................................8

*Scureman v. Judge,*
    626 A.2d 5 (Del. Ch. 1992) ................................................................16

*Union Oil Co. v. Mobil Pipeline Co.,*
    No. 19395-N, 2006 Del. Ch. LEXIS 213 (Del. Ch. Sept. 25, 2006)........................9, 10

**STATE STATUTES**

C.P.L.R. § 213(2) ................................................................16

**RULES**

Federal Rule of Civil Procedure 12(c)................................................................1, 8

Rule 12(b)(6)................................................................8

**OTHER AUTHORITIES**

1 Williston on Contracts § 5:18 (4th ed. 2014)................................................................9

2 Williston on Contracts § 6:40 (4th Ed. 2014)................................................................11

**<u>INTRODUCTION</u>**

Intercept Pharmaceuticals, Inc. ("Intercept") respectfully requests, pursuant to Federal Rule of Civil Procedure 12(c), that the Court dismiss all counts asserted in the Counterclaim of Chris Howard (the "Counterclaim"), and enter judgment in Intercept's favor on its Complaint for Declaratory Judgment.  In his Counterclaim, Howard claims entitlement to 108,000 shares of Intercept's common stock, which he had an option to purchase from Intercept at a price of $0.50 per share pursuant to the terms of certain written contractual agreements.  To exercise those options, the agreements required, *inter alia*, that Howard deliver payment in full to Intercept at its New York City offices on or before 5:00 p.m. on December 31, 2007.  Despite this requirement, despite that Intercept sent written reminders to him about the approaching deadline in December 2007, and despite that Howard lived around the corner from Intercept's offices and could easily have delivered such payment in person by the deadline, Intercept has never received any such payment, let alone by the December 31, 2007 deadline.  Howard alleges only that he put a "check in the mail" to Intercept on December 26, 2007—a mere five days before his options were due to expire—and then never followed-up again with Intercept to ensure receipt for over six years, which follow-up occurred in January 2014 only after Intercept had gone public, engaged in a follow-on offering, publicly announced positive clinical trial news about its drug product and the fair market value of its stock had soared.  But Howard concedes that he has no cancelled check establishing payment, and that he never received stock certificates for the shares he allegedly owns, which certificates would have been sent to him if he had made payment.

The Court should dismiss Howard's Counterclaim because he has failed to allege facts sufficient to support any plausible claim for breach of the option agreement upon which his claim is based.  And, even if the Counterclaim somehow passes muster under Rule 12(c), his

breach of contract claim is time barred under New York's six-year statute of limitations for contract actions.1  For these reasons, set forth in greater detail below, the Court should grant this motion.

**SUMMARY OF HOWARD'S ALLEGATIONS**[2]

**I.      The Parties**

Intercept is a biopharmaceutical company located in New York City that was founded in 2002 and that focuses on the development of pharmaceutical drugs for the treatment of liver, gastrointestinal, metabolic, and other diseases.  Countercl. ¶¶ 2, 5, 6.  Howard served as a consultant to or an employee of Intercept from April 1, 2005 until August 1, 2007 when his employment was terminated.  Countercl. ¶¶ 5, 13; see also Compl. ¶ 4; Answer ¶ 4.

**II.     The Parties Entered Into Written Agreements Governing The Grant And Exercise of Howard's Stock Options**

*A.     Howard's Consulting Agreement*

Howard began consulting for Intercept on or about April 1, 2005.  Countercl. ¶ 5.  After about four months, Intercept and Howard entered into the Amended and Restated Consulting Agreement as of September 1, 2005, a copy of which is attached to the Counterclaim as Exhibit 7 (the "Consulting Agreement").  *Id.* ¶ 7 (Decl. of Michael J. Bayer ¶ 2 (hereinafter "Bayer Decl."))[3]  The Consulting Agreement described, *inter alia*, Howard's scope of work and his compensation, and provided for the grant to Howard of an option to purchase 108,000 shares of Common Stock of Intercept (the " Howard Stock Option") at an exercise price equal to $0.50 per

---

[1]      Howard's claim for declaratory relief also should be dismissed as a matter of law in that it is redundant with his breach of contract claim, and in any event, it is barred by the equitable doctrine of laches.

[2]      The summary set forth in this section of Intercept's brief is based on undisputed facts, or is taken directly from the allegations in Howard's Counterclaim.  Pursuant to the legal standard applicable to motions for judgment on the pleadings, Howard's well pleaded factual allegations are presumed true but only for purposes of this motion.

[3]      For convenience, a copy of all documents cited in this brief, including those attached to the pleadings, have been provided as exhibits to the Bayer Declaration.

share.  *Id.*  The Consulting Agreement expressly provided that the "granting and terms of the [Howard] Stock Option shall be subject to the terms and conditions of a Stock Option Agreement to be entered into between [Howard] and [Intercept] upon execution of this Agreement."). Countercl. Ex. 7, Art. 3.2 (Bayer Decl. ¶ 2).

> ### B.    *Howard's Stock Option Agreement*

The Stock Option Agreement referenced in the Consulting Agreement, a copy of which is attached as Exhibit 1 to the Complaint (the "Howard Stock Option Agreement"), provides that Howard's stock option is granted "on the terms provided herein and in [Intercept's] 2003 Stock Incentive Plan" (the "Intercept 2003 Stock Plan").  Compl. ¶ 9 and attached Ex. 1 (Bayer Decl. ¶ 3); Answer ¶ 9.  The Howard Stock Option Agreement provides, with respect to the exercise of the Howard Stock Option, that: "Each election to exercise this option shall be in writing in the form of notice attached hereto as Exhibit A, signed by [Howard], and received by [Intercept] at its principal office, accompanied by [the Howard Stock Option Agreement], and payment in full in the manner provided in the [Intercept 2003 Stock Plan]."  *Id.*

> ### C.    *Intercept's 2003 Stock Plan*

The Intercept 2003 Stock Plan, which is expressly referenced in the Howard Stock Option Agreement, provides that stock options "may be exercised by delivery to [Intercept] of a written notice of exercise signed by the proper person … together with payment in full as specified in Section 5(f) for the number of shares for which the Option is exercised."  Answer to Countercl. Ex. 1 §5(e) (Bayer Decl. ¶ 4).  Section 5(f) provides for payment upon exercise "in cash or by check, payable to the order of [Intercept]."  *Id.* §5(f)(1).

> ### D.    *The Employment Agreement*

After consulting for Intercept for approximately 1½ years, Howard entered into an Employment Agreement with Intercept, a copy of which is attached as Exhibit 3 to the

Complaint.  Compl. ¶ 13 and attached Ex. 3 (the "Employment Agreement") (Bayer Decl. ¶ 5).

Howard's employment with Intercept under the Employment Agreement commenced as of

August 1, 2006, and was "at-will" with no definite term.  *Id*., Ex. 3, at ¶ 1 (Bayer Decl. ¶ 5).  The

Employment Agreement confirmed the prior grant to Howard, "pursuant to [the Intercept 2003

Stock Plan]," of an option to purchase 108,000 shares of Common Stock evidenced by the

Howard Stock Option Agreement.  *Id*. at ¶ 3.5.  The Employment Agreement also expressly

provided that the stock option granted to Howard "remains subject to the terms of the [Intercept

2003 Stock Plan] and the [Howard Stock Option Agreement]."  *Id*.

        E.    *The Termination Agreement*

        Howard worked as an Intercept employee for less than a year.  His employment was

terminated effective August 1, 2007.  In connection with the termination of his employment,

Intercept and Howard entered into a letter agreement dated July 23, 2007 providing, *inter alia,*

for certain severance benefits for Howard in consideration of a general release of all claims by

Howard  (the "Termination Agreement").  Countercl. ¶ 11 and attached Ex. 1 (Bayer Decl. ¶ 6).

One such benefit was the extension of the three-month deadline specified in the Howard Stock

Option Agreement and the Intercept 2003 Stock Plan, within which Howard was required to

exercise the Howard Stock Option.  *Id*., Ex. 1 §1 (Bayer Decl. ¶ 6).  Accordingly, the

Termination Agreement provided expressly that, upon Howard's timely execution and return of

the Termination Agreement, including the release, Howard would have "until 5:00 p.m. (New

York City time) on December 31, 2007 to exercise the vested portion" of the Howard Stock

Option.  *Id.*  As set forth in the Howard Stock Option Agreement and the 2003 Intercept Stock

Plan, "exercise" expressly required two acts by Howard: (1) signing and returning to Intercept's

office a signed Notice of Stock Option Exercise in the form attached at Exhibit A to the Howard

Stock Option Agreement; and (2) delivering to Intercept's office cash or a check for the full exercise price.  Compl. ¶ 9 and attached Ex. 1, at Art. 3(a) (Bayer Decl. ¶ 3); Answer to Countercl. Ex. 1 § 5(f)(1) (Bayer Decl. ¶ 4).  Howard signed the Termination Agreement on August 1, 2007.  Countercl. ¶ 13.

### III.    <u>Howard Failed to Pay The Required Exercise Price to Exercise His Stock Options</u>

Thereafter, on October 9, 2007, about two months after the termination of his employment, Howard sent an email to Intercept expressing his interest in "executing [his] stock options" and inquiring about the "exact amount required for the purchase of these options." Countercl. ¶ 16 and attached Ex. 5 at 5-6 (Bayer Decl. ¶ 8).  He also requested a "copy of 'Exhibit A', as referenced in the [Intercept 2003 Stock Option Agreement]," which is the Notice of Stock Option Exercise.  *Id*.  On or about October 12, 2007, Intercept emailed a copy of the Notice of Stock Option Exercise to Howard as requested.  Countercl. ¶ 17.

The Notice of Stock Option Exercise contains an express confirmation by Howard that he is the holder of a stock option "granted to [him] under [the Intercept 2003 Stock Plan] for the purchase of 108,000 shares of Common Stock of [Intercept] at a purchase price of $0.50 per share."  *Id.* ¶ 22 and attached Ex. 2 (Bayer Decl. ¶ 7).  The Notice of Stock Option Exercise further provides that:

> I hereby exercise my option to purchase 108,000 shares of Common Stock (the "Shares"), for which I have enclosed a check in the amount of $54,000.00.  Please register my stock certificate as follows:
>
> Name(s):  Chris Howard."

*Id.*  Howard signed the Notice of Stock Option Exercise on October 30, 2007 and returned it to Intercept.  Countercl. ¶ 22.  Howard, however, did not enclose a check in any amount with the signed Notice of Stock Option Exercise.  *Id.*

Not having received payment from Howard, Intercept sent at least three emails to him in December 2007, reminding him that he had to make payment by December 31, 2007 before the Howard Stock Option expired.  Accordingly, by an email dated December 21, 2007, a copy of which is attached as Exhibit 6 to Howard's Counterclaim, Intercept's Nora White ("White") advised Howard that "the office will be closed next week so if you are going to send a check for executing those options (which should be done by 12/31), please give me a heads up—I'll be checking the mail every couple days."  Countercl. ¶ 24 and attached Ex. 6 (Bayer Decl. ¶ 9). When White heard nothing from Howard, she sent him a second email advising him that "I'm just following up to see if you still plan to send a check for your option exercise.  I believe we should be in receipt of it by 12/31 and I don't want you to [miss] the deadline."  Countercl. ¶ 27 and attached Ex. 6 (Bayer Decl. ¶ 9).  She asked that Howard "please let [her] know what you plan to do if you have a chance."  *Id.*  When Howard still did not respond, Intercept's CEO and founder, Mark Pruzanski ("Pruzanski") sent a third email to Howard reminding him yet again "to get payment in for your stock options for the end of the year."  Countercl. ¶ 26 and attached Ex. 6 (Bayer Decl. ¶ 9).

Intercept did not receive payment from Howard in any amount by 5:00 p.m. (New York City time) on December 31, 2007 as required by the Termination Agreement, nor at any time thereafter.  Compl. ¶ 16.  Indeed, Intercept never heard again from Howard after his October 2007 communications with Intercept until Howard's wife, purportedly on his behalf, sent an email to Intercept over six years later in January 2014 seeking copies of the stock certificates for the shares that she claimed were the subject of the expired Howard Stock Option.  Countercl. ¶ 34 (Bayer Decl. ¶ 10).[4]

---

[4]      Although this email was not originally attached to the pleadings, the Court may consider it in evaluating Intercept's motion as a document upon which the pleadings rely heavily for "its terms and effect, thereby rendering

In the over six-year interim, between Howard's last communications with Intercept in October 2007 and his wife's email in January 2014, Intercept had engaged in an initial public offering in October 2012, a follow-on offering in June 2013, and announced on January 9, 2014 the successful clinical testing of its drug for the treatment of serious liver disease, which Intercept characterized publicly as a "major milestone."  Countercl. ¶ 34 and attached Ex. 8 (Bayer Decl. ¶ 11).  Ms. Howard's first email after over six years of her husband's silence arrived at Intercept a mere five days after Intercept's press release describing the success of its clinical testing.  And, during the hiatus between Howard's October 2007 communications and his wife's January 14, 2014 email demanding her spouse's stock certificates, the value of Intercept's now publicly traded stock had soared to over $400 per share.  *See* Countercl. at Prayer for Relief ¶ 7.

Howard now demands either specific performance or compensatory damages for "a sum at or exceeding $47,520,000," which he characterizes as the current market value of the Intercept common stock to which he claims entitlement under the Termination Agreement, the Howard Stock Option Agreement and the Intercept 2003 Stock Plan.  *See* Countercl. ¶ 6, 7.  However, his demand ignores yet another event that occurred during the more than six-year period of silence about Howard's stock options, namely a 1-for-5.7778 reverse stock split that occurred in September 2012 that would substantially reduce the number and value of any shares at issue. *See* Answer to Countercl. ¶ 42.

---

the document integral to the [pleadings]." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (quotations omitted).

## ARGUMENT

### I.      Legal Standard

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards as a motion to dismiss under Rule 12(b)(6).  *See Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012).  To survive a Rule 12(c) motion, Howard must demonstrate that his Counterclaim contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  While the Court accepts the well-pleaded allegations in the Counterclaim as true, it may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks and citation omitted)).[5]  The Court may consider "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case."  *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009).

### II.     Howard's Counterclaim Should be Dismissed For Failure Adequately To Plead The Elements of a Breach of Contract

The Court should dismiss Howard's Counterclaim because Howard has failed to plead sufficient facts to demonstrate that he timely exercised the Howard Stock Option in compliance with the express terms of the parties' written contractual agreements.  Under governing Delaware

---

[5]      Similarly, Delaware courts decline "to accept conclusory allegations unsupported by specific facts or to draw unreasonable inferences in favor of the non-moving party." *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).

Law,[6] the elements of a claim for breach of contract are: "(1) a contractual obligation; (2) a breach of that obligation . . .; and (3) a resulting damage to the plaintiff." *BCE Emergis Corp. v. Cmty. Health Solutions of Am., Inc.*, 148 Fed. Appx. 204, 215 (5th Cir. 2005). To support the existence of a valid contractual obligation, Howard must plead, among other things, that Intercept made him an offer to purchase shares, and that he effected a valid acceptance of that offer. *See Fanean v. Rite Aid Corp. of Del., Inc.*, 984 A.2d 812, 822 (Del. Super. Ct. 2009) (dismissing complaint as inadequate where it failed adequately to allege acceptance). Howard must also plead that he performed any material contractual obligations precedent to any obligation on the part of Intercept to perform. *See Manley Toys, Ltd. v. Toys "R" Us, Inc.*, No. 12-3072*, 2013 U.S. Dist. LEXIS 8369, at *8 (D. N.J. Jan. 22, 2013).

An option contract is considered "a continuing offer whose duration and method of exercise is strictly controlled by the agreement that created it." *Union Oil Co. v. Mobil Pipeline Co.*, No. 19395-N, 2006 Del. Ch. LEXIS 213, at *14 n.60 (Del. Ch. Sept. 25, 2006) (internal quotation marks and citation omitted). As with any contract, "[t]he offeror is the master of his offer [and] may prescribe as many conditions, terms or the like as he may wish, including but not limited to, the time, place and method of acceptance." *Kroeze v. Chloride Group Ltd.*, 572 F. 2d 1099, 1105 (5th Cir. 1978). Thus, "[w]hen the optionee decides to exercise his option, he must act unconditionally and according to the terms of the option" and "the general attitude of the courts is to construe the attempt to accept the terms offered under the option strictly." 1 Williston on Contracts § 5:18 (4th ed. 2014); *see also Union Oil*, 2006 Del. Ch. LEXIS 213, at

---

[6]     Pursuant to Section 10(f) of the Plan, both the terms of the Plan itself, and all awards of stock options made thereunder are to be "governed by and interpreted in accordance with the laws of the [State of Delaware], [sic] without regard to any applicable conflicts of law." *See* Answer to Counterclaim, Ex. 1, at 8 (Bayer Decl. ¶ 4).

*14 ("The terms of the option are strictly construed in accordance with the contract provision that created the right.").

Here, Howard has not pleaded—and cannot plead—sufficient facts to demonstrate his compliance with the requirements for exercising his stock options under the parties' written contractual agreements.  Both the 2003 Intercept Stock Plan and the Howard Stock Option Agreement clearly and unambiguously provide that Howard could only exercise his stock options by ensuring that Intercept received, at is principal offices in New York City: (1) a signed copy of the Notice of Stock Option Exercise, and (2) payment in full.  *See* Compl. Ex. 1 § 3(a) (Bayer Decl. ¶¶ 3, 4) ("[e]ach election to exercise this option shall be in writing in the form of notice attached hereto as Exhibit A, signed by the Participant, and *received by the company* at its principal office, accompanied by this agreement, and payment in full in the manner provided in the Plan.") (emphasis added).  Howard expressly agreed to these terms when he signed the Howard Stock Option Agreement.  Compl. Ex. 1 at 6; Countercl. Ex. 2 (Bayer Decl. ¶ 3). Howard's Counterclaim is completely devoid of any allegation that Intercept ever received the required payment.  The closest it comes is in alleging that Howard mailed a check for $54,000.00 to Intercept via First Class Mail on December 26, 2007.  Countercl. ¶ 25.  But even assuming for purposes of this motion that this allegation is true, *mailing* the payment does not constitute compliance with the terms of the Howard Stock Option Agreement and the 2003 Intercept Stock Plan that Intercept timely *receive* such payment.  As such, Howard has not pleaded a plausible claim for a breach of contract, and his claim should be dismissed.

Howard's alleged mailing of the $54,000.00 check, even when assumed true for purposes of this motion, fails to support even an inference that Intercept received such payment under the so-called "dispatch rule" that ordinarily presumes receipt of an acceptance upon its mailing

10

because that rule is inapplicable to option contracts like the Howard Stock Option Agreement. *See* 2 Williston on Contracts §6:40 (4th Ed. 2014)  ("[I]n the option contract setting the offeror must receive the acceptance within the option period, and the dispatch rule is inapplicable"). Even if the dispatch rule could apply here, the Howard Stock Option Agreement's unambiguous requirement that Intercept had to actually receive payment in order to effect an exercise of the Howard Stock Option defeats any presumption that Howard validly exercised his stock options by allegedly mailing the required payment.  *See id.* ("It follows from the power of the offeror to dictate the conditions of the contract, as well as the way that it may be accepted, that the offeror may require the . . . medium used to communicate the acceptance to be received before a contract shall be formed.").

### III.     Howard's Breach of Contract Claim Is Barred By The Applicable Statute of Limitations

Even if Howard had adequately pleaded the elements of a breach of contract claim (which he did not), such claim should be dismissed pursuant to New York's statute of limitations for contract actions because he sat on his hands for more than six years before asserting entitlement to the shares that are the subject of the Howard Stock Option.  *See Muto v. CBS Corp.*, 668 F.3d 53, 57 (2d Cir. 2012) (N.Y. C.P.L.R. § 213(2) provides a six-year statute of limitations for contract actions).  Under New York law, a breach of contract claim accrues when the contract is breached, regardless of whether or not the plaintiff is aware of the breach.  *See Clarendon Nat'l Ins. Co. v. Culley*, No. 11-2629 (HB), 2012 U.S. Dist. LEXIS 58067, at *8 (S.D.N.Y. Apr. 25, 2012).  Here, Howard's breach of contract claim accrued more than six years before this action was filed in March 2014, and it should therefore be dismissed as untimely as a matter of law.

11

*Eluv Holdings (BVI) Ltd. V. Dotomi, LLC*, No. 6894–VCP, 2013 WL 1200273 (Del. Ch. Mar. 26, 2013) is a factually analogous case that provides an instructive analysis of how the statute of limitations bars claims like Howard's.  There, Eluv claimed entitlement to certain shares of Dotomi's common stock pursuant to various stock options it allegedly exercised in and before June 2005.  *See id.* at *1.  Eluv's attempted exercises were ineffective because, among other things, it did not timely make the required exercise payments.  *Id.* at *3.  More than six years later, in August 2011, Eluv sought compensation for the shares it allegedly owned pursuant to the option in connection with a merger between Dotomi and another company.  *Id.*  But Dotomi refused to pay, claiming that Eluv had never effectively exercised its stock options.  *Id.*

The court ruled that any claim Eluv may have had for breach of contract accrued not when Eluv sought to exercise its rights as a shareholder in August 2011, but in June 2005 at the latest.  *Id.* at *7.  The court reasoned that, by June 2005, it was clear that plaintiffs had attempted to exercise their options, that Dotomi did not recognize plaintiffs as shareholders, and that plaintiffs were on notice of those facts.  *Id.*  The court emphasized that Dotomi's corporate records, including its stock ledger and capitalization tables, did not identify Eluv as shareholders, and that Eluv never possessed stock certificates for the disputed shares.  *Id.* at *6.  The court was also troubled by "the relative ease with which Plaintiffs could have discovered their injury."  *Id.* at *12.  As the court explained,

> A one sentence email insisting that Dotomi confirm that Eluv validly had exercised the Option and was considered a shareholder likely would have been effectual, especially coupled with a reasonable degree of follow up.  Yet, instead of pressing the issue, and in the face of several indications that Eluv was not considered a shareholder, Plaintiffs sat idly by until August 2011, when they discovered that, as a result of an impending merger, shares of Dotomi stock had become quite valuable.

*Id.*  In light of these facts, the court found that any breach of contract claim Eluv may have had was time barred.  *Id.*

Here, as in *Eluv*, any breach of the agreements governing the Howard Stock Option occurred, if at all, when Intercept failed to recognize Howard as an Intercept shareholder after Howard purportedly exercised his stock options.  Under any possible interpretation of the allegations in the pleadings, any such breach occurred more than six years before this case was filed.  For example, Howard claims, contrary to the express requirements of the parties' written agreements, that he "exercised" his stock options by returning the signed Notice of Stock Option Exercise to Intercept on or around October 30, 2007.  Countercl. ¶ 22.  Assuming for purposes of this motion that this is true (which Intercept expressly denies), Howard had notice that Intercept did not consider him to be a shareholder by no later than December 21, 2007, when White sent him an email asking him to "give [her] a heads up" if he was "going to send a check for executing those options (which should be done by 12/31)."  *Id.* ¶ 24 and attached Ex. 6 (Bayer Decl. ¶ 9).  Moreover, even if Howard's alleged mailing of a $54,000.00 check on December 26, 2007 effected a valid exercise of his stock options (which Intercept again denies), Howard was on notice the very next day that Intercept did not consider him a valid shareholder when he received emails from White and Pruzanski reminding him of the December 31 deadline and asking him what he planned to do about his options.  *See id.* ¶¶ 24–27 and Ex. 6, at 2–3 (Bayer Decl. ¶ 9).  Howard has no record, in the form of a cancelled check, bank statement, or otherwise, that Intercept ever cashed the purported exercise payment.  *See id.*, Ex. 4 at 1–2 (Bayer Decl. ¶ 12).  Nor did he ever receive stock certificates (restricted or otherwise) or any other documentation evidencing his purported stock ownership.  It should therefore have been clear to Howard by no later than January 2008, upon receipt of his December 2007 bank

statement showing the continued presence of the $54,000 he claims to have paid Intercept, and his non-receipt of any documentation evidencing his ownership of Intercept's common stock, that Intercept did not consider him to be a shareholder.

In the face of numerous unmistakable indications that Intercept did not consider him a shareholder, Howard, like Eluv, did nothing.  He never sent as much as a one-sentence email to Intercept over his six-year plus silence requesting confirmation that he had validly exercised his stock options.  Instead, like Eluv, he sat on his hands for more than six years, until January 2014—well after Intercept had completed initial and follow-on public offerings of its stock, and after it announced successful clinical test results for its liver disease treatment that sent the price of its stock soaring—before asserting entitlement to the disputed shares.  Worse, Howard now seeks to parlay his own protracted inaction into a windfall by claiming entitlement to (or compensation for) the same 108,000 shares that he would have received upon timely exercise of his stock options back in 2007, notwithstanding the 1-for-5.7778 reverse stock split that occurred in September 2012 that would have substantially reduced the number and value of those shares. *See* Answer to Countercl. ¶ 42.  The Court should not reward such opportunism on Howard's part, but should dismiss Howard's breach of contract claim as untimely.

### IV.   The Court Should Also Dismiss Howard's Claim For Declaratory Relief

####   A.   *Howard's Claim for Declaratory Relief Is Redundant With His Breach of Contract Claim*

The Court should also dismiss Howard's claim for declaratory relief because it is redundant with his breach of contract claim and no useful purpose would be served by allowing that claim to proceed separately.  Under the federal Declaratory Judgment Act, the Court has discretion over whether to resolve a controversy by issuing a declaration of the parties' rights. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007).  A key factor for the Court

14

to consider in exercising that discretion is whether the declaratory judgment claim would "serve a useful purpose." *JJCK, LLC v. Project Lifesaver Int'l*, No. 10-930-LPS, 2011 U.S. Dist. LEXIS 71367, at *17 (D. Del. July 1, 2011).  Where the declaratory judgment claim bears "complete identity of factual and legal issues with another claim being adjudicated by the parties, the Court is within its discretion to dismiss the declaratory judgment action." *Id.* at 17-18 (internal quotation marks omitted).  Moreover, "courts routinely dismiss counterclaims that seek to generate an independent piece of litigation out of issues that are already before the court; this includes counterclaims that . . . simply seek the opposite effect of the complaint." *Intercon Solutions, Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1065 (E.D. Ill. 2013).

Here, Howard's claim for declaratory judgment is completely redundant with his breach of contract claim.  In essence, Howard seeks a declaration that (1) he validly exercised his stock options pursuant to the applicable agreements, (2) he is therefore entitled to certain shares of Intercept's common stock pursuant to those options, and (3) the statute of limitations for his breach of contract claim (and any analogous claim in equity) did not begin to run until January 2014.  *See* Countercl. Prayer for Relief ¶¶ 1–5.  All of these issues will necessarily be resolved in the course of adjudicating Howard's breach of contract claim, and a finding in Howard's favor on the breach of contract claim will effectively grant Howard the declaration he seeks.  Under these circumstances, it is appropriate for the Court to dismiss the declaratory judgment claim. *See Penn Mut. Life Ins. Co. v. Norma Espinosa*, No. 09-300-JJF, 2010 U.S. Dist. LEXIS 77334, at *18-19 (D. Del. July 30, 2010) (dismissing declaratory judgment claims that would effectively be resolved by adjudication of an analogous breach of contract action).

### B.     Howard's Claim For Declaratory Relief Is Barred By Laches

Even if Howard's claim for declaratory judgment were not redundant with his breach of contract claim (which it is), the Court should still dismiss the claim pursuant to the equitable doctrine of laches.  Laches "prevent[s] the enforcement of a claim in equity if the plaintiff delayed unreasonably in asserting the claim, thereby causing the defendants to change their position to their detriment."  *Scureman v. Judge*, 626 A.2d 5, 13 (Del. Ch. 1992).  While "[a] statute of limitations period at law does not automatically bar an action in equity," courts often apply the statute of limitations for an analogous claim at law in considering a laches defense. *Eluv*, 2013 WL at *5 (internal quotation marks and citations omitted).  "Absent a tolling of the limitations period, a party's failure to file within an analogous statute of limitations, if any, is typically presumptive evidence of laches."  *Id.*; *see also Phillips v. the Hellenic*, 179 F.Supp. 5, 7 (S.D.N.Y. 1959) ("the court, as a rule of thumb, looks to the analogous state statute of limitations and if it has run, inexcusable delay on [plaintiff's] part and prejudice to [defendants] is presumed.")

Here, Howard's claim for declaratory relief seeks an adjudication of his rights under the agreements governing the granting and exercise of his stock options.  Thus, the analogous statute of limitations at law is the six-year statute of limitations for breach of contract action under N.Y. C.P.L.R. § 213(2).  As explained more fully in Section III above, any such breach occurred, if at all, as early as December 21, 2007, but in any event no later than January 2008, when Howard was on notice that Intercept failed to recognize him as an owner of its common stock following the purported exercise of his stock options.  Despite having such notice, and despite the ease with which Howard could have earlier verified his stock ownership, Howard lay in wait for more than six years until after two public offerings and a positive press announcement caused Intercept's

common stock to substantially appreciate in value before finally asserting entitlement to the disputed shares.  Such conduct is precisely the type of activity that the laches doctrine prohibits, and the Court should therefore dismiss his declaratory judgment claim.  *See Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982) (laches "is rooted in the maxim that equity aids the vigilant, not those who slumber on their rights.")

## CONCLUSION

For the reasons set forth above, Intercept respectfully requests that the Court grant this motion and dismiss Howard's Counterclaim.  Moreover, because dismissal of Howard's Counterclaim is tantamount to granting the relief Intercept requests in its Complaint for Declaratory Judgment, Intercept also requests that the Court enter judgment in favor of Intercept on its declaratory judgment claim.

Dated:  June 2, 2014

Respectfully submitted,

  __/s/ Robert D. Cultice__
Sanket J. Bulsara
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone:  (212) 230-8800
Fax:  (212) 230-8888
Email:  sanket.bulsara@wilmerhale.com

Robert D. Cultice (admitted *pro hac vice*)
Michael J. Bayer (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone:  (617) 526-6000
Fax:  (617) 526-5000
Email:  robert.cultice@wilmerhale.com
           michael.bayer@wilmerhale.com

17

*Attorneys for Intercept Pharmaceuticals, Inc.*

18