UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERCEPT PHARMACEUTICALS, INC., )<br>)<br>Plaintiff and Counterclaim-Defendant, )<br>)<br>vs. )<br>)<br>CHRIS HOWARD, )<br>)<br>Defendant and Counterclaim-Plaintiff. ) | Civil Action No.: 1:14-cv-01480-AKH |

**CHRIS HOWARD'S MEMORANDUM OF LAW IN OPPOSITION TO INTERCEPT PHARMACEUTICALS, INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS**

MERCEDES COLWIN
MARK A. BECKMAN
**GORDON & REES LLP**
**90 BROAD STREET**
**NEW YORK, NEW YORK 10004**
**(212) 269-5500**

STUART M. GORDON
JAMES K. HOLDER
**GORDON & REES LLP**
**275 BATTERY STREET, SUITE 2000**
**SAN FRANCISCO, CA 94111**
**(415) 986-5900**

*Attorneys for Defendant and Counterclaim-Plaintiff Chris Howard*

# TABLE OF CONTENTS

**Page No.**

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 1

ARGUMENT ........................................................................................................... 3

    I.       STANDARD OF REVIEW ............................................................................3

    II.     HOWARD HAS STATED A CLAIM FOR BREACH OF CONTRACT
          PROPERLY ...................................................................................................4

         A.     New York Contracts Law Governs This Case ................................... 4

         B.     Howard Has Set Forth Sufficient Facts to Support His Breach of Contract
             Claim .............................................................................................. 5

    III.    HOWARD'S BREACH OF CONTRACT CLAIM IS NOT BARRED BY THE
          STATUTE OF LIMITATIONS .....................................................................9

    IV.    HOWARD HAS STATED A CLAIM FOR DECLARATORY RELIEF
          PROPERLY .................................................................................................15

         A.     Howard Is Entitled to Plead In the Alternative ............................... 15

         B.     Laches Does Not Apply ................................................................... 16

CONCLUSION ...................................................................................................... 17

i

## TABLE OF AUTHORITIES

**Page No.**

**Cases**

*AD/SAT a Div. of Skylight, Inc. v. Associated Press*
  885 F. Supp. 511 (S.D.N.Y. 1995) ............................................. 3

*Aetna Life & Cas. Co. v. Nelson*
  81 N.Y.2d 399 (1993) ............................................................... 10

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) ................................................................... 3

*Bell Atlantic Corp. v. Twombly*
  550 U.S. 544 (2007) ................................................................... 3

*Cleveland v. Caplaw Enters.*
  448 F.3d 518 (2d Cir. 2006) ...................................................... 3

*Elden v. Merril Lynch, Pierce, Fenner & Smith, Inc.*
  No. 08 Civ. 8738 (RJS) 2001 U.S. Dist. LEXIS 35886 .............. 4

*Ely-Cruikshank Co. v. Bank of Montreal*
  81 N.Y.2d 399 (1993) ............................................................... 10

*Hermanowski v. Acton Corp.*
  729 F.2d 921 (2d. Cir. 1984) ..................................................... 10

*Kapsis v. Am. Home Mortg. Servicing Inc.*
  923 F. Supp. 2d 430 (E.D.N.Y. 2013) ....................................... 5

*Klaxon Co. v. Stentor Elec. Mfg. Co.*
  313 U.S. 487, 85 L. Ed. 1477 61 S. Ct. 1020 (1941) .................. 4

*Kroeze v. Chloride Group, Ltd.*
  572 F. 2d 1099 (5th Cir. 1987) .................................................. 4

*L-7 Designs, Inc. v. Old Navy, LLC*
  647 F.3d 419 (2d Cir. 2011) ...................................................... 3

*Lubicz v. Rosen*
  54 A.D.2d 894, 388 N.Y.S.2d 16
  (2d Dep't 1976) ......................................................................... 16

*Manley Toys, Ltd. v. Toys "R" Us, Inc.*
  No. 12-3072, 2013 U.S. Dist. LEXIS 8369
  (D. N.J. Jan. 22, 2013) .............................................................. 4

# <u>TABLE OF AUTHORITIES</u>

**Page No.**

*Maxim Group LLC v. Life Partners Holdings, Inc.*
690 F. Supp. 2d 293 (S.D.N.Y 2010) ................................................................................. 10

*Mellon Bank N.A. v. United Bank Corp.*
31 F.3d 113 (2d Cir. 1994) ............................................................................................... 6

*Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*
NO. 06 Civ. 4624, 2008 U.S. Dist. LEXIS 35319
(S.D.N.Y. Apr. 30, 2008)................................................................................................ 16

*Sheppard v. Beerman*
18 F.3d 147 (2d Cir. 1994) ............................................................................................... 3

*Shubert Theatrical Co. v. Rath*
271 Fed. 827 (2d Cir.1921)............................................................................................. 8

*Skrodelis v. Norbergs*
707 N.Y.S.2d 197 (N.Y. App. Div. 2000) ...................................................................... 16

*Soroof Trading Dev. Co., v. G.E. Fuel Cell Sys. LLC*
842 F. Supp. 2d 502 (S.D.N.Y 2012) ............................................................................ 14

*Zurich Am. Ins. Co. v. Paxson Commc'ns Corp.*
No. 03 Civ. 1503, 2004 U.S. Dist. LEXIS 9093
(S.D.N.Y. May 19, 2004)................................................................................................ 16

**Rules**

Federal Rules of Civil Procedure
Rule 12................................................................................................................................ 3

New York Civil Practice Law and Rules
Section 203 ...................................................................................................................... 10

New York Civil Practice Laws and Rules
Section 213 ........................................................................................................................ 9

Securities Act
Rule 144............................................................................................................................ 12

## INTRODUCTION

Intercept Pharmaceuticals, Inc.'s ("Intercept") improvident motion for judgment on the pleadings is its latest effort wrongfully to deny Chris Howard ("Howard") the benefit of the stock options he earned as one of Intercept's very first employees.  The Court should deny Intercept's motion, which is simply an ill-advised attempt to short-circuit the litigation process and deny Howard his right to conduct discovery to support his pleadings and have his day in court.  Howard has pled more-than-sufficient facts in his Counterclaim to support his claims for declaratory judgment and breach of contract, against Intercept, which should be allowed to proceed.  Intercept's taking issue with Howard's factual basis for his claims does not entitle Intercept to prevail – its version of the facts is equally contested by Howard, and thus are issues to be determined by the trier of fact after full discovery.  Accordingly, the motion must be denied and Howard's claims be permitted to proceed.

## FACTUAL BACKGROUND

In Intercept's "Summary of Howard's Allegations," Intercept ignores and misstates several of the allegations in Howard's Counterclaim, especially those regarding the Termination Agreement, which is the operative contract in this case.  Memorandum of Law in Support of Intercept Pharmaceuticals Inc.'s Motion for Judgment on the Pleadings ("Intercept Mot.") at p. 2. The relevant facts, which must be assumed true, are set forth here.

The Termination Agreement contains an "Entire Agreement" provision, which states that upon execution, it contains the "entire understanding and agreement between the parties … with respect to [Howard's] severance benefits", and that it "cancels all previous oral and written

1

negotiations, agreements and commitments in connection therewith."  Counterclaim at Exhibit 1, ("Termination Agreement"), ¶ 14.[1]

The Termination Agreement sets forth alternative severance provisions for lesser or greater benefits.  The less generous severance option provides that if Howard refused to sign the letter agreement, "[Howard] shall not receive any severance benefits from the Company."  *Id.* Instead, Howard would simply be entitled to final wages, unused vacation time, and "up to ninety (90) days after the Termination Date to exercise any vested stock rights [he] may have (as provided for by the plans)."  *Id.*  The more generous severance package, which was available only if Howard agreed to "timely sign and return this letter agreement", which he did, provided Howard with the ability to obtain severance benefits in exchange for several releases, including a non-compete agreement, an agreement to return company property, a confidentiality agreement, and a non-disparagement agreement.  *Id.*  In exchange for Howard's execution of all these agreements, Intercept agreed to provide a lump sum payment equivalent to 3 months of Howard's salary, 3 months of paid medical coverage, and the assurance that "you will have until 5:00 p.m. (New York City time) on December 31, 2007 to exercise the vested portion of your options to purchase shares of the Company's common stock."  *Id.*

Despite the "Entire Agreement" provision, the Termination Agreement does not contain any provision defining the term "exercise", nor does the Termination Agreement delineate a specific method to "exercise" the vested portion of Howard's stock options.  *Id.*; Counterclaim ¶ 14.  Moreover, the Termination Agreement specifies neither a deadline for Howard to submit payment to Intercept once he had exercised his stock options (which he did), nor  a deadline for

---

[1] The Employment Agreement contained a similar "Entire Agreement" provision.  However the Employment Agreement's "Entire Agreement" provision contained a savings clause which specifically exempted the 2005 Option Agreement.  Intercept Complaint at Exhibit 3 ("Employment Agreement"), ¶ 6.  The Termination Agreement does not contain any such savings clause.

Intercept to deliver the stock certificates to Howard. *Id.*; Counterclaim ¶ 15. And unlike the "Compensation and Benefits" section of the Employment Agreement, the more generous severance package in the Termination Agreement contains no provision making it "subject to the terms" of the 2003 Stock Option Plan, or any other earlier stock option agreement. *Compare*, "Employment Agreement" at ¶ 3.5, *with* "Termination Agreement" at ¶ 1.

## ARGUMENT

### I.  STANDARD OF REVIEW

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 520 (2d Cir. 2006). The Court "must assume the facts alleged in the complaint to be true and must liberally construe them in the light most favorable to the plaintiff." *AD/SAT a Div. of Skylight, Inc. v. Associated Press*, 885 F. Supp. 511, 514 (S.D.N.Y. 1995); accord *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).

The allegations in a complaint must meet a standard of "plausibility." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that [plaintiff is entitled to relief]." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "On a 12(c) motion, the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy*, LLC, 647 F.3d 419, 422 (2d Cir. 2011). As will be made clear below, Intercept's motion for judgment on the pleadings should be denied because Howard has set forth factually plausible claims.

## II.     HOWARD HAS STATED A CLAIM FOR BREACH OF CONTRACT PROPERLY

Howard has pled sufficient facts to state a plausible cause of action for breach of contract.

### A.  New York Contracts Law Governs This Case

Contrary to Intercept's argument, New York law – not Delaware law[2] – is controlling in this case.  The Termination Agreement contains an "Applicable Law" provision, which states in relevant part, "[t]his letter agreement shall be interpreted and construed by the laws of the State of New York, without regard to conflict of laws provisions."  Termination Agreement, ¶ 13.[3]

A federal court sitting in a diversity case applies the choice of law rules of the forum state.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941).  Here, New York's choice of law rules apply, and pursuant to those rules the Termination Agreement's choice of law provision controls because it is the only contract which was in effect at the time of Howard's attempted exercise, and Intercept's breach, and it thus "governed the activity that lies at the heart of this case."  *Elden v. Merril Lynch, Pierce, Fenner & Smith, Inc.*, No. 08 Civ. 8738 (RJS), 2001 U.S. Dist. LEXIS 35886, at *14 (resolving competing choice of law provisions in contract action in favor of application of New York law).

The Termination Agreement's "Entire Agreement" provision indicates that, upon execution, it contains the "entire understanding and agreement between the parties … with respect to [Howard's] severance benefits", and that it "cancels all previous oral and written negotiations, agreements and commitments in connection therewith."  ¶ 14 "Entire Agreement".

---

[2] New Jersey law is not controlling to the extent that Intercept is attempting to make such an argument by citing *Manley Toys, Ltd. v. Toys "R" Us, Inc.*, No. 12-3072, 2013 U.S. Dist. LEXIS 8369, at *8 (D. N.J. Jan. 22, 2013), an unpublished opinion from the District of New Jersey applying New Jersey law.  Florida law is not controlling to the extent that Intercept is attempting to make such an argument by citing *Kroeze v. Chloride Group, Ltd.*, 572 F. 2d 1099 (5th Cir. 1987), a Fifth Circuit Court of Appeals case decided under Florida law.
[3] The Employment Agreement contained a similar provision entitled, "Governing Law", which indicated that it too was "governed by and construed in accordance with the laws of the State of New York (without reference to the conflict of laws provisions thereof)."  Employment Agreement, ¶ 8.

Thus, following full execution of the Termination Agreement, the contractual relationship between Intercept and Howard regarding Howard's severance benefits, including Howard's right to exercise his stock options, was and is governed by the Termination Agreement; not the 2003 Stock Option Plan. Accordingly, New York contract law governs this case.

**B. Howard Has Set Forth Sufficient Facts to Support His Breach of Contract Claim**

To plead a breach of contract claim under New York law, a party must allege "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." *Kapsis v. Am. Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430, 450 (E.D.N.Y. 2013).

Here, Howard properly has alleged each of the required elements. First, Howard has alleged the existence of the contract, *i.e.*, the Termination Agreement, and has set forth its essential terms and included a copy of the contract. Counterclaim, ¶ 38. Second, Howard has alleged that he performed under the Termination Agreement by exercising his vested stock options and completing all necessary conditions precedent for performance by Intercept. Counterclaim, ¶ 39-40. Third, Howard has alleged that despite his own performance, Intercept did not perform, breaching the contract "by refusing to deliver Howard's shares of stock" when requested. Counterclaim, ¶ 41. Finally, Howard has alleged that the consequences of Intercept's non-performance have damaged him in excess of the minimum jurisdictional amount. Counterclaim, ¶ 42.

Intercept's only argument in support of its motion regarding the adequacy of Howard's pleading of the elements of breach of contract is that Howard's Counterclaim fails adequately to plead Howard's performance because it "is completely devoid of any allegation that Intercept

ever received the required payment."  Intercept Mot. at p. 10.  Intercept's argument is unavailing for several reasons.

First, at the most basic factual level, Intercept's assertion is incorrect; Howard <u>does</u> allege that "Intercept had received his $54,000.00 check sent by First Class Mail." Counterclaim, ¶ 30. Howard's allegation of receipt by Intercept of Howard's check is even more apparent in Howard's accompanying Answer to Intercept's Complaint, in which Howard clearly states "Howard mailed the check for $54,000.00 to Intercept on December 26, 2007 by First Class Mail and was never informed by Intercept, prior to January 2014, that Intercept had either received the check later or had not received it at all, and Howard therefore alleges that it <u>was</u> received by Intercept."  Howard Answer, ¶ 16 (emphasis in original). Howard has no idea as to when the check was received and what happened with it once it was received, and he will not be able to ascertain these facts until he has had the opportunity to conduct discovery, because those facts are in the sole possession of Intercept.

Second, Intercept's argument fails because it requires the Court to accept Intercept's opinion regarding the meaning of ambiguous contract terms.  It is well-settled if a contract is deemed ambiguous, it is not subject to decision on a motion for judgment on the pleadings.  *See Mellon Bank N.A. v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir. 1994).  Here, the ambiguity presented by the multiple contracts and e-mail communications in this case may not be resolved on an incomplete record.  For example, although Intercept claims to know what the 2003 Intercept Stock Plan and the 2005 Howard Stock Option Agreement "unambiguously provide", Intercept's argument ignores the ambiguity as to the application of those earlier agreements and the impact of the subsequent execution of the Termination Agreement.

Moreover, even within the Termination Agreement itself there is ambiguity and dispute regarding the meaning of the material term "exercise".  In particular, the less generous benefits option in the Termination Agreement states in part:  "[i]f you choose not to sign and return this letter agreement … you will have up to ninety (90) days after the Termination Date to exercise any vested stock rights you may have (as provided for by the plans)."  By comparison, the more generous benefits option provides, "if you timely sign and return this letter agreement, … you will have until 5:00 p.m. (New York City time) on December 31, 2007 to exercise the vested portion of your options to purchase shares of the Company's common stock."  Notably absent from the more generous benefits option is any provision requiring that stock rights be exercised "(as provided for by the plans)."  The absence of this language from the more generous benefits option in the Termination Agreement – the option chosen by Howard – may be construed as an acknowledgment by Intercept that the stock options provided by the more generous benefits option are not subject to the exercise requirements in the 2003 Plan.  This is an ambiguity which cannot be resolved by the pleadings.

Third, the limited record of communications between Howard and Intercept leading up to December 31, 2007, which are attached to the Counterclaim as Exhibits 5 and 6, only adds to the list of disputed issues of fact.  For example, Nora White's email from December 27, 2007, states, "I honestly don't know if getting [the check] later would be any problem – I doubt if the check is dated before end of year, but please let me know what you plan to do if you have a chance." Counterclaim at Exhibit 6. [4]  This email could be interpreted as an acknowledgment that Howard's sending of the payment prior to December 31, 2007 at 5:00 p.m. was sufficient, not receipt as suggested by Intercept.  Similarly, Mark Pruzanski's ("Pruzanski") email from October 21, 2007

---

[4] See also Counterclaim Exhibit 3, which clearly shows Howard's check was dated December 26, 2007 – *i.e.*, before the end of the year.

raises further issues of fact which only discovery can clarify.  Counterclaim at Exhibit 5.  In his October 21, 2007 email, Pruzanski responds to Howard's earlier email in which he had asked, "OK, does that mean, I send in the completed form, and no check?" with the response that, "Yes, please do and just maybe send us an email saying you'll get us the payment before the end of the year. M." This response by Intercept's CEO, in which he recommends that Howard fill out the Exhibit A Notice of Stock Option Exercise form[5] without payment, which he did, could very easily be interpreted as an indication that he was simply making up the requirements for exercising options under the Termination Agreement *ad-hoc* because the exercise requirements are not clearly spelled out in the Termination Agreement.  Again, this factual dispute cannot be resolved absent full discovery and thus the motion must be denied.

Fourth, Intercept's argument that Howard should have hand-delivered the check to Intercept is likewise without merit.  Nora White emailed Howard on Friday, December 21, 2007 and informed him that "the office will be closed next week" and invited Howard to send the check by mail and indicated that she would be "checking the mail every couple days." Counterclaim at Exhibit 6.  If Howard had attempted to hand-deliver the check, as suggested by Intercept now, he would have found a closed office.

Finally, Intercept's attempt to disclaim the operation of the "dispatch rule" is also fatally flawed for similar reasons.  First, Intercept has failed to cite any controlling authority, and it is very likely a court applying New York law would conclude that the dispatch rule is applicable.  *See Shubert Theatrical Co. v. Rath*, 271 Fed. 827 (2d Cir.1921) (applying New York law and holding that notice of exercise of option was effective when mailed).  Second, as discussed above, whether "receipt" of payment by December 31, 2007 was required, or whether "dispatch" into the mail was sufficient involves the resolution of questions of fact regarding which agreements are controlling,

---

[5] Counterclaim at Exhibit 2 ("Notice of Stock Option Exercise").

and whether the parties' communications or other actions demonstrate a contrary intent.  Third,

discovery is necessary to determine when and/or whether Intercept in fact received Howard's

payment check.  Intercept does not dispute Howard's factual assertion that he mailed the $54,000

check to Intercept on December 26, 2007.  Intercept Answer, ¶ 25.  Moreover, on January 13, 2014,

Intercept's legal counsel Bryan Yoon ("Yoon") indicated by email in response to Howard's

request for the stock certificates that "I have internal emails from January 2008 showing we

hadn't received the check until after the expiration period."  Counterclaim at Exhibit 4.  This

email clearly implies that Intercept did in fact receive the check.  Unless and until discovery is

allowed to proceed in this case, Howard will have no access to these "internal emails", which

might very well lend support to Howard's claims.[6]

These are not determinations that can be made at this early stage and thus the Court should

deny the motion in its entirety.

### III.   HOWARD'S BREACH OF CONTRACT CLAIM IS NOT BARRED BY THE STATUTE OF LIMITATIONS

Howard's breach of contract claim is not barred by the statute of limitations because the

statute of limitations did not begin to run until Howard's claim accrued in January 2014;  until

Intercept refused to send Howard the stock certificates he requested, allowing him to sell his

shares, his damages had not yet occurred.

New York provides a six-year statute of limitations for breach of contract actions.

N.Y.C.P.L.R. § 213(2).  Under New York law, a statute of limitations begins to run when a cause

---

[6] Recent current events regarding GM's internal documents in the ongoing defective ignition switch litigation, of which the Court may take judicial notice, once again demonstrate the importance of discovery to uncover critical facts previously denied and to ensure an accurate factual record.  *See* Ashby Jones, *GM Report Draws Plaintiffs' Attorneys*, Wall Street Journal, June 9, 2014, *available at* http://online.wsj.com/news/articles/SB40001424052702304710104579608464131664936?mg=reno64-wsj&url=http%3A%2F%2Fonline.wsj.com%2Farticle%2FSB40001424052702304710104579608464131664936.html; Nathan Bormey, *GM: Report: Lawyers Kept Recall Defect From Top Execs*, USA Today, Jun. 9, 2014, *available at* http://www.usatoday.com/story/money/cars/2014/06/09/gm-valukas-report-lawyers-barra-millikin/10247505/.

of action "accrues" (N.Y.C.P.L.R. § 203(a)), that is, when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court. *Aetna Life & Cas. Co. v. Nelson*, 81 N.Y.2d 399, 402 (1993).  In contract actions, a claim accrues at the time of the breach, regardless of whether the plaintiff is aware of the breach at that time. *Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402-04 (1993).

The leading case interpreting New York law regarding the time at which a breach occurs in a matter involving the failure to deliver stock pursuant to an option agreement is *Hermanowski v. Acton Corp.*, 729 F.2d 921 (2d. Cir. 1984).  In *Hermanowski*, a plaintiff-employee agreed in April 1975 to terminate his employment contract with the defendant-employer in return for a cash payment and a five-year non-qualified stock option.  In June 1976, the defendant notified the plaintiff that the stock option had been cancelled.  The plaintiff ignored this and in September 1979 attempted to exercise a portion of the stock option by sending a $10,000 check and requesting delivery of 5,000 shares of stock. *Id.* at 922.  The defendant-employer returned the check two months later in November 1979, stating that it had determined that the employee had no exercisable stock option. *Id.*  The key issue was determining when the breach occurred.  The Second Circuit upheld the district court's "carefully drafted opinion" which determined that the breach of the option contract occurred in November 1979, "when the defendant had refused to deliver the stock." *Id.; see also Maxim Group LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 299 (S.D.N.Y 2010) ("Assuming a breach occurred, the date of the breach is … the date [defendant] refused to deliver the shares of stock.")  Thus, the rule in New York in cases involving the non-delivery of stock is that a breach occurs when the defendant wrongfully refuses to deliver the stock – not simply when the stock purchase is made.

10

Here, Intercept **never** communicated any refusal to deliver the stock prior to January 2014. Accordingly, the statute of limitations in this case did not accrue until January 2014, when Intercept first refused Howard's demand for delivery of the stock, and which is thus the first time Howard suffered damages.

Intercept's reliance on a Delaware Court of Chancery Opinion applying Delaware's 3-year statute of limitations is misplaced. Although that case did involve stock options, the similarity ends there. This case is not governed by Delaware law – it is governed by New York law. Delaware has a 3-year statute of limitations period, demonstrating a legislative intent by Delaware to be less protective of injured parties than New York, which has a 6-year statute of limitations. In addition, the Delaware case was decided on a motion for summary judgment after extensive discovery – not a motion for judgment on the pleadings before any discovery whatsoever. Moreover, it was clear in the Delaware case that the plaintiff had never made any attempt to pay for the stock options; a material difference from this case in which Howard did mail a check to Intercept for the full purchase price as evidenced by the carbon copy of Howard's check, which is attached to his Counterclaim. And as noted above, Howard's assertion of that fact must be assumed true for purposes of this motion.

Further, although Howard purchased the Intercept stock in December 2007, there was no deadline in the Termination Agreement for Intercept to cash Howard's check, physically to deliver the stock certificates to Howard, or to register Howard's shares. In fact, as to registration, the Notice of Stock Option Exercise that Howard signed on October 30, 2007 specifically contemplates a long and "indefinite period" of delay before the shares would be registered and delivered to Howard. Notice of Stock Option Exercise, Counterclaim at Exhibit 2. The Notice of Stock Option Exercise provides the following disclaimer:

I understand that (i) the Shares have not been registered under the Securities Act and are "restricted securities" within the meaning of Rule 144 under the Securities Act; (ii) the Shares cannot be sold, transferred or otherwise disposed of unless they are subsequently registered under the Securities Act or an exemption from registration is then available; (iii) in any event, the exemption from registration under Rule 144 will not be available for at least one year and even then will not be available unless a public market then exists for the Common Stock, adequate information concerning the Company is then available to the public, and other terms and conditions of Rule 144 are complied with; and (iv) there is now no registration statement on file with the Securities and Exchange Commission with respect to any stock of the Company and the Company has no obligation or current intention to register the Shares under the Securities Act.

Howard reasonably relied upon this language.  He accepted there would be a substantial and indefinite time period before the shares he purchased would be available to him, because no public market existed, and because Intercept had neither registered nor intended to register the shares with the SEC, until Intercept had completed an IPO, which did not happen until 2012.

Intercept's arguments regarding the date on which Howard "had notice" that Intercept did not consider him to be a shareholder are also specious.  Howard was not "on notice" when he received reminder emails regarding payment on December 27, 2007, because he already had put the payment check in the mail the day before.  It was thus entirely reasonable for Howard to ignore the December 27, 2007 emails, knowing the check was safely in the mail and that it would likely take 2-3 days to arrive in the holiday season mail.

For Intercept to have put Howard "on notice" that it did not consider him a shareholder, Intercept would have had to communicate this fact to Howard at some point **after** December 31, 2007, which it did not do.  Intercept clearly knew Howard wanted to complete the purchase of the stock options Intercept admits he had exercised.  Intercept's position as the receiving party granted it superior knowledge regarding the actual receipt or non-receipt of payment.  To the extent that it could be argued that one of the parties was "sitting on his hands", this argument weighs heavily against Intercept, and Howard is the aggrieved.

Despite Intercept's arguments regarding the "notice" supposedly conferred by the December 27, 2007 email, in a tacit admission that Howard could not possibly have received such notice until sometime after December 31, 2007, Intercept puzzlingly suggests that Howard should have been "on notice" that he was not an Intercept shareholder upon receipt of his "December 2007 bank statement showing the continued presence of the $54,000.00 he claims to have paid Intercept." Intercept Mot. at p. 14.   This claim is clearly without merit for the simple reason that there was no deadline in the Termination Agreement for Intercept to cash Howard's payment check.  In addition, for a party who is claiming that this case can be resolved without any discovery, it is indeed strange that Intercept is now making an argument based on sheer speculation as to what facts might exist in documents (bank statements) beyond the pleadings and judicially noticeable facts.  In any event, it would not have shown up on his December bank statement whether Intercept had received his payment or not.  There are no facts supporting this "bank statement" argument, and to the extent Intercept desires to pursue this argument, it should withdraw its motion and proceed with discovery.

Moreover, Intercept's claim that Howard has no evidence that Intercept ever cashed the exercise payment is disingenuous at best.  None of the relevant agreements contain a condition requiring Howard to ensure that Intercept cashed his check by a date-certain.  The contracts only required that Howard exercise his option and make payment – both of which he did, and clearly claims he did in his pleadings.  Plaintiff's attempt at misdirection is a textbook red herring and does nothing to alter the necessary conclusion:  this case is not ripe for dismissal.

Lastly, Intercept's discussion of the 1-for-5.7778 reverse stock split, which apparently occurred in September 2012 and would have reduced the number of Howard's shares from 108,000 to approximately 18,692 shares, is also a distraction.  At approximately $440 per share

on the date of Intercept's breach of contract in January 2014, those shares would still have been valued at over $8.2 million, which is well in excess of the jurisdictional minimum.  This is all that is required at the pleading stage.  Oddly, Intercept defeats its own argument; by demonstrating questions of fact as to damages, it makes clear its motion must be denied.

Based on the foregoing, Howard's claims are timely because:  (1) the statute of limitations did not accrue until Intercept breached the Termination Agreement in January, 2014 by refusing to deliver Howard's shares; (2) Intercept has not cited any valid New York authority supporting the "on notice" argument; and, (3) even if it had, Intercept is wrong because it did not inform Howard that it did not consider him a shareholder at any time between December 31, 2007 and January 2014.

Alternatively, in the unlikely event that despite the facially sufficient allegations in the pleadings, the Court determines that the statute of limitations accrued in January 2008, the Court should equitably toll the statute of limitations until at least 2012.  "Under the equitable tolling doctrine, a statute of limitations does not run against a plaintiff who was justifiably ignorant of his cause of action."  *Soroof Trading Dev. Co., v. G.E. Fuel Cell Sys. LLC*, 842 F. Supp. 2d 502, 517 (S.D.N.Y 2012).

Here, given the small size of Intercept and the close relationship between the parties during the relevant time period, Howard's actions were perfectly reasonable. Howard was an early, invaluable employee of Intercept who, through multiple communications with both Pruzanski, Intercept's co-founder and CEO, as well as Nora White, Intercept's Director of Operations, had clearly and unambiguously communicated his intent to exercise his stock options – not the least of which was Howard's return of the Notice of Stock Option Exercise which he completed in October 2007.  Intercept clearly knew Howard's intention to exercise his

stock options, and it was eminently reasonable for Howard to believe that once he put his check in the mail on December 26, 2007, someone from Intercept would contact him if there were any issues with his exercise of his stock options; and certainly if for some reason Intercept had not received his check.

Moreover, because Howard understood that Intercept would not register or issue a stock certificate unless and until Intercept underwent an IPO, Howard had no reason to be suspicious of the lack of communication from Intercept regarding receipt of his stock payment.  Because the Intercept stock that Howard had purchased and which was being held by Intercept was not registered or transferrable until the IPO in 2012, equity would support tolling the statute of limitations at least until the date of the IPO in 2012.  As is common, when stocks basically have no marketable value, individuals do not think about the need to obtain the physical stock certificates.  But when a change in circumstances occurs, as did here, that is when an individual pays attention.  Howard did not sit on his rights or ignore his situation, but rather did as anyone would do; he paid for them and hoped for the best, which in fact happened approximately six years later.  Equity demands he be given, at the least, his day in court.

## IV.   HOWARD HAS STATED A CLAIM FOR DECLARATORY RELIEF PROPERLY

### A.  Howard Is Entitled to Plead in the Alternative

Intercept's claim is not that Howard has failed to plead the requisite elements necessary for a cause of action for declaratory relief, only that Howard's declaratory relief claim is "redundant."  The Court should decline Intercept's request to cast off Howard's claim for declaratory judgment while at the same time maintaining Intercept's own cause of action for declaratory judgment.  To the extent that Howard's counterclaim for breach of contract ultimately may prove to be identical to its counterclaim for declaratory relief, the Court

nevertheless should decline to dismiss one (or the other) of these causes of action.  This

jurisdiction has recognized that "[w]hile the facts underlying both the [breach of contract] and

[declaratory judgment claims] may be identical and while both claims may ultimately prove to be

coextensive, it is . . . well-established that declaratory relief is alternative or cumulative and not

exclusive or extraordinary."  *Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*, No. 06

Civ. 4624, 2008 U.S. Dist. LEXIS 35319, at *6 n.7 (S.D.N.Y. Apr. 30, 2008) (quoting *Zurich*

*Am. Ins. Co. v. Paxson Commc'ns Corp.*, No. 03 Civ. 1503,2004 U.S. Dist. LEXIS 9093, at *6

(S.D.N.Y. May 19, 2004)).  The Court should "preserve its ability to exercise its discretion to

provide declaratory relief . . . at the appropriate time."  *Zurich*, 2004 U.S. Dist. LEXIS 9093, at

*6.  Accordingly, the Court should recognize Howard's right to plead alternatively and

cumulatively, and deny Intercept's motion outright.

### B.  Laches Does Not Apply

Intercept's attempt to plead laches is misplaced.  Laches is an equitable doctrine which

bars the enforcement of a right where there has been an unreasonable and inexcusable delay

resulting in prejudice to a party.  *Skrodelis v. Norbergs*, 707 N.Y.S.2d 197, 198 (N.Y. App. Div.

2000).  The mere lapse of time without a showing of prejudice will not sustain a defense of

laches.  *Id.*  Laches will not bar recovery where there is a reasonable excuse for one's failure to

take action in the assertion of his or her rights.  *Lubicz v. Rosen*, 54 A.D.2d 894, 388 N.Y.S.2d

16 (2d Dep't 1976) (holding that a combination of circumstances made laches inappropriate as a

bar to suit).

Here, as discussed above, Howard did not sleep on his rights.  Rather, he exercised his

rights regarding his investment, and, as is the case with nearly any long term privately held

investment, he waited patiently for the circumstances to be favorable for him to make a profit on

16

his investment, as he agreed to do pursuant to the disclaimer in the Notice of Stock Option Exercise referenced above.  He agreed to be patient, and he was.  The lapse of time between Howard's communications with Intercept was merely a function of waiting until the investment was registered and went public, and the time was right to sell.  Intercept attempts to cast Howard in a negative light by characterizing him as "laying in wait."  However, this is precisely what Howard had specifically agreed to do when he exercised his Notice of Stock Option Exercise:  to exercise his option to purchase the stock and then patiently wait, hoping that the stock would be registered and brought public through an IPO and thus have marketable (and significant) value.  If any party has been "laying in wait" in a manner that is suspicious, it is Intercept, which, through its inaction, created the impression to Howard that he had taken every action he needed to take, that the check had been received (which Howard still believes, has alleged, and which the Yoon email supports on its face) and that Intercept was holding the stock until such time as it was capable of being registered and issued, whereafter Howard could demand delivery.  Equity heavily favors Howard in this situation and certainly on the pleadings at this stage.

## CONCLUSION

For the foregoing reasons, Howard respectfully requests that Intercept's motion be denied, thus permitting this case to be decided on a complete factual record after Howard has had the right to conduct meaningful discovery.  In the alternative, if despite the clear need for discovery in this case the Court is inclined to grant Intercept's motion, Howard requests leave to amend to cure any perceived defects, so that this case may be decided on the merits.

New York, New York
June 18, 2014                                        *Mercedes Colwin*
                                                    Mercedes Colwin (MC 3862)
                                                    Mark A. Beckman (MB 6750)
                                                    Gordon & Rees LLP
                                                    90 Broad Street
                                                    New York, NY  10024

(212) 269-5500
mcolwin@gordonrees.com
mbeckman@gordonrees.com

*Admitted Pro Hac Vice*
Stuart M. Gordon (CA SBN: 037477)
James K. Holder (CA SBN: 267843)
Gordon & Rees LLP275 Battery Street,
Suite 2000
(415) 986-5900
sgordon@gordonrees.com
jholder@gordonrees.com

*Attorneys for Defendant and*
*Counter-Plaintiff Chris Howard*