**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| INTERCEPT PHARMACEUTICALS, INC., <br><br> Plaintiff and Counterclaim-Defendant, <br><br> v. <br><br> CHRIS HOWARD, <br><br> Defendant and Counterclaim-Plaintiff. | No.  1:14-cv-01480-AKH |

**<u>INTERCEPT PHARMACEUTICALS, INC.'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION ..................................................................................1

ARGUMENT .......................................................................................3

I.      HOWARD HAS NOT PLEADED A LEGALLY SUFFICIENT CLAIM
FOR BREACH OF CONTRACT ...........................................................3

    A.     Howard's Theory That The Termination Agreement Is the Only Operative
Contract Mandates Dismissal of His Counterclaim..............................................3

    B.     The Stock Option Agreement, Not The Termination Agreement, Governs
The Exercise of Howard's Stock Options...........................................................4

    C.     Howard Has Failed to Plead a Legally Sufficient Claim For Breach of The
Stock Option Agreement.......................................................................7

II.     HOWARD'S COUNTERCLAIM IS BARRED BY THE STATUTE OF
LIMITATIONS...............................................................................12

III.    HOWARD'S CLAIM FOR DECLARATORY RELIEF IS REDUNDANT
AND BARRED BY LACHES ..............................................................16

    A.     Howard's Claim for Declaratory Relief Should Be Dismissed As
Redundant With His Breach of Contract Claim .................................................16

    B.     Howard's Claim for Declaratory Relief is Barred by Laches...........................16

CONCLUSION....................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................................8

*Beekman Inv. Partners, L.P. v. Alene Candles, Inc.*,
    No. 05 CIV. 8746, 2006 U.S. Dist. LEXIS 5341 (S.D.N.Y. Feb. 14, 2006) ............5

*Don King Prods., Inc. v. Douglas*,
    742 F. Supp. 786 (S.D.N.Y. 1990) .......................................................................10

*Ennocenti v. Unisys Tech. Servs., LLC*,
    No. 12-CV-6367, 2012 U.S. Dist. LEXIS 159763 (W.D.N.Y. Nov. 7, 2012) ........8

*Hermanowski v. Acton Corp.*,
    729 F.2d 921 (2d Cir. 1984)..........................................................................13, 14

*Horowitz v. Am. Int'l Group, Inc.*,
    No. 09-Civ-7312 (PAC), 2010 U.S. Dist. LEXIS 103489 (S.D.N.Y. Sept. 30, 2010)............16

*Int'l Klafter Co. v. Cont'l Cas. Co.*,
    869 F.2d 96 (2d Cir. 1989).....................................................................................9

*Maxim Group LLC v. Life Partners Holdings, Inc.*,
    690 F. Supp. 2d 293 (S.D.N.Y. 2010)..............................................................13, 14

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
    906 F.2d 884 (2d Cir. 1990)......................................................................4, 9, 11

*Netzer v. Continuity Graphic Assocs.*,
    963 F. Supp. 1308 (S.D.N.Y. 1997).....................................................................15

*Oram v. SoulCycle LLC*,
    No. 13 Civ. 2976, 2013 U.S. Dist. LEXIS 154438 (S.D.N.Y. Oct. 28, 2013) ........8

*Phillips v. The Hellenic*,
    179 F. Supp. 5 (S.D.N.Y. 1959)...........................................................................17

*Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*,
    No. 06 Civ. 4626, 2008 U.S. Dist. LEXIS 35319 (S.D.N.Y. April 30, 2008)........16

*Raeman v. County of Ont.*,
    No. 12-CV-6009 CJS, 2013 U.S. Dist. LEXIS 35008 (W.D.N.Y. Mar. 11, 2013) ................12

*Shubert Theatrical Co. v. Rath*,
    271 F. 827 (2d Cir. 1921).....................................................................................11

*SVS, Inc. v. Rabbit Ears Prods., Inc.*,
  No. 91 Civ. 6632 (CSH), 1991 U.S. Dist. LEXIS 18199 (S.D.N.Y. Dec. 16, 1991) ...........4, 6

*United States ex rel. B & R, Inc. v. Donald Lane Constr.*,
  19 F. Supp. 2d 217 (D. Del. 1998) ...........................................................................................10

**STATE CASES**

*AJW Partners, LLC v. Peak Entm't Holdings, Inc.*,
  11 Misc. 3d 1054(A) (N.Y. Sup. Ct. 2006) ............................................................................11

*Eluv Holdings (BVI) Ltd. v. Dotomi, LLC*,
  No. 6894-VCP, 2013 WL 1200273 (Del. Ch. Mar. 26, 2013).........................................14, 15

*Smith v. Mattia*,
  No. 4498-VCN, 2010 WL 412030 (Del. Ch. Feb. 1, 2010)....................................................15

*Tauber v. Bankers Trust Co.*,
  230 A.D.2d 312 (N.Y. App. Div. 1997) .................................................................................11

*Union Oil Co. v. Mobil Pipeline Co.*,
  No. 19395-N, 2006 Del. Ch. LEXIS 213 (Del. Ch. Dec. 15, 2006) .......................................11

**RULES**

Rule 12(c)..........................................................................................................................7, 9

**OTHER AUTHORITIES**

Restatement Second, of Contracts § 63(b)...................................................................................11

Selling Restricted and Control Securities, *available at* https://www.sec.gov/investor/pubs/........15

## <u>INTRODUCTION</u>

In his Memorandum of Law in Opposition to Intercept Pharmaceuticals, Inc.'s Motion for Judgment on the Pleadings (the "Opp. Br."), Defendant Chris Howard ("Howard") attempts to rescue his legally insufficient pleadings in a futile effort to manufacture a claim for breach of contract where none exists.  Howard's Opposition should be seen for precisely what it is: a misguided *post hoc* attempt to create factual issues in the face of the plain and unambiguous contracts that he signed that mandate dismissal of his Counterclaim and a declaratory judgment in favor of Intercept.

First, Howard admits that his Counterclaim hangs on one untenable legal assumption— that the Termination Agreement supersedes ***<u>all</u>*** of the pre-existing contracts between the parties concerning the grant of stock options, and is therefore the ***<u>only</u>*** contract governing the grant of stock options.  *See* Opp. Br. at 4–5.  If this is true, as Howard alleges, the Court should dismiss Howard's Counterclaim as a matter of law.  The fatal legal flaw in Howard's argument is that the Termination Agreement—by its plain and unambiguous language—is not the source of any stock options.  The only contract that provided stock options for Howard was the 2005 Stock Option Agreement (the "Stock Option Agreement"), which granted them pursuant to Intercept's 2003 Stock Incentive Plan (the "Plan").  But Howard now argues that the Stock Option Agreement and the Plan ceased to operate upon execution of the Termination Agreement.  If that contention is accepted as true for the purposes of this motion, Howard no longer has a claim for stock options because, according to him, his right ceased to exist once the Termination Agreement was signed and allegedly superseded all pre-existing contracts, including the Stock Option Agreement and the Plan.

The reality is that the Termination Agreement, by its plain and unambiguous terms, did not supersede either the Stock Option Agreement or the Plan.  Indeed, the plain language of the

Termination Agreement makes crystal clear that the only agreements that are superseded concern Howard's "severance benefits," not his stock options.  Termination Agreement § 14 (Bayer Decl., ¶ 6).  And, the contemporaneous emails attached to Howard's Answer and Counterclaim (which contain Howard's binding admissions) confirm that Howard himself understood at the time he signed the Termination Agreement that the Stock Option Agreement and the Plan remained in full force and effect, and that these agreements required him to ensure that Intercept received *both* a signed Notice of Stock Option Exercise (the "Notice") *and* payment in full in order to validly exercise his stock options.  Intercept never received the required payment, and Howard has not—and cannot—plausibly allege otherwise.

Howard's attempt to rescue his Counterclaim from the legal bar imposed by New York's six-year statute of limitations also falls short.  Assuming for purposes of this motion that Howard did exercise his stock options in December 2007 as he has alleged, Intercept would have committed its first breach not when it refused to deliver Howard's shares over six years later in January 2014, but when it failed to recognize him as a stock owner as of December 31, 2007.  Thus, Howard's claim accrued, if at all, more than six years before this action commenced, and the Court should dismiss his Counterclaim as untimely.

Finally, Howard never disputes Intercept's point that his request for declaratory relief adds nothing to the existing litigation, serves no useful purpose, and should therefore be dismissed as redundant.  And, his attempt to avoid the bar imposed by laches misses the mark entirely.  Had Howard taken reasonable steps—indeed, any steps—to confirm Intercept's receipt of the check that he allegedly sent by regular mail just before the exercise deadline, this litigation would not have been necessary.  But instead, it is undisputed that Howard did not communicate with Intercept about stock options after October 2007 until January 2014, *over six and a half*

*years later.*  And, when his spouse finally contacted Intercept on his behalf for the first time, it was only after Intercept had gone public and announced a clinical trial milestone that sent its stock soaring.  Howard's delay was inexcusable, and his claim for declaratory relief is barred by laches.

## ARGUMENT

## I. HOWARD HAS NOT PLEADED A LEGALLY SUFFICIENT CLAIM FOR BREACH OF CONTRACT

### A. Howard's Theory That The Termination Agreement Is the Only Operative Contract Mandates Dismissal of His Counterclaim

Howard asserts in his Opposition that the Termination Agreement "is the only contract which was in effect at the time of Howard's attempted exercise."  Opp. Br. at 4.  In support of this assertion, he claims that the "Entire Agreement" clause in section 14 of the Termination Agreement cancels all prior agreements concerning Howard's stock options, including the Stock Option Agreement and the Plan.  *See id.* at 4–5.  But Howard can point to no language in the Termination Agreement that awarded him any stock options.  This is because the only contract that granted Howard stock options was the Stock Option Agreement, which granted those options pursuant to the Plan.  *See* Stock Option Agreement § 1 (Bayer Decl., ¶ 3).  Howard has not (and cannot) allege that he exercised any of his stock options before signing the Termination Agreement.  Thus, if Howard's act of signing the Termination Agreement canceled the Stock Option Agreement, then at that very moment, pursuant to the Plan, Howard's stock options reverted to Intercept and no longer belonged to Howard.  *See* Plan § 4 (Bayer Decl., ¶ 4) ("If any Award expires or is terminated, surrendered or ***canceled*** without having been fully exercised . . . the unused Common Stock covered by such Award shall again be available for the grant of Awards under the Plan . . . .") (emphasis added).  Thus, if Howard's theory is correct, he had no

stock options to exercise after signing the Termination Agreement, Intercept had no delivery

obligation to breach, and he has no claim.

### B.    The Stock Option Agreement, Not The Termination Agreement, Governs The Exercise of Howard's Stock Options

The reality is that Howard's attempts to circumvent the unambiguous requirements for

exercising his options under the Stock Option Agreement fail as a matter of law based on the

plain and unambiguous language of the Termination Agreement—which expressly limits

cancellation to pre-existing contracts ***regarding severance benefits***—and on Howard's

contemporaneous written admissions establishing that he believed that the Stock Option

Agreement and the Plan remained valid and existing contracts after the Termination Agreement

had been signed.

The Court must give the Termination Agreement the effect the parties intended, which

intent "must be gleaned from all corners of the documents, rather than from sentences or clauses

viewed in isolation." *SVS, Inc. v. Rabbit Ears Prods., Inc*., No. 91 Civ. 6632 (CSH), 1991 U.S.

Dist. LEXIS 18199, at *19 (S.D.N.Y. Dec. 16, 1991) (quoting *Pantone, Inc. v. Esselte Letraset

Ltd*., 691 F.Supp. 768, 771 (S.D.N.Y. 1988) (internal quotation marks omitted).[1]  The proper

construction of unambiguous contract language is a legal issue for the court, and "[l]anguage

whose meaning is otherwise plain is not ambiguous merely because the parties urge different

interpretations in the litigation." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889

(2d Cir. 1990).  A party may not "manufacture ambiguity" in an otherwise unambiguous

---

[1]      The supposed "choice of law" issue presented in Howard's Opposition is nothing but a red herring.  *See
generally* Opp. Br. at 4–5.  Intercept never disputes that New York Law governs the interpretation of the
Termination Agreement by virtue of the "Applicable Law" provision it contains.  *See* Termination Agreement § 13
(Bayer Decl., ¶ 6).  Nor does Howard dispute that Delaware Law governs the interpretation of the Plan, and all
awards of stock options made thereunder, including those made in the Stock Option Agreement.  *See* Opening Br. at
9 n.6; Answer to Countercl., Ex. 1 ¶ 10(f) (Bayer Decl., ¶ 4).  For the purpose of this dispositive motion, the Court
need decide only whether the Stock Option Agreement survived the execution of the Termination Agreement.

provision by reading into it a meaning that is inconsistent with the rest of the contract, or by pointing to extrinsic evidence of its meaning. *Beekman Inv. Partners, L.P. v. Alene Candles, Inc.*, No. 05 CIV. 8746, 2006 U.S. Dist. LEXIS 5341, at *10–11 (S.D.N.Y. Feb. 14, 2006).

Here, the four corners of the Termination Agreement unambiguously demonstrate that the parties intended the Stock Option Agreement and the Plan to survive Howard's execution of the Termination Agreement.  By its plain terms, the "Entire Agreement" clause on which Howard bases his argument provides that the Termination Agreement *only* "constitutes the entire understanding and agreement between the parties hereto **with respect to [Howard's] severance benefits**" and *only* "cancels all previous oral and written negotiations, agreements and commitments **in connection therewith**."  Termination Agreement § 14 (Bayer Decl., ¶ 6) (emphasis added).  Because the Stock Option Agreement, which is the source of Howard's stock option rights, was signed years before his employment was terminated by Intercept and provided that Howard's options could "not be exercised unless [Howard], at the time he . . . exercises [his] option is, and has been at all times since the Grant Date, an employee" of Intercept, there is no plausible way that stock options could be considered part of Howard's "severance benefits." Stock Option Agreement §3(b), (Bayer Decl., ¶ 3).

Other provisions in the Termination Agreement confirm that Howard's stock options were not part of his "severance benefits."  For example, section 1 of the Termination Agreement, entitled "Description of Severance Benefits," does not grant Howard any stock options, nor could it in the absence of a stock option plan.  (Bayer Decl., ¶ 6).  The *only* language in section 1 that mentions stock options at all is the following language extending the deadline for Howard to exercise his previously granted stock options:

> In addition, should you timely sign and return this letter agreement . . . you will
> have until 5:00 p.m. (New York City Time) on December 31, 2007 to exercise the

vested portion of your options to purchase shares of the Company's common stock.  For the avoidance of doubt, the vesting of such options shall cease on the Termination Date.

Termination Agreement § 1 (Bayer Decl., ¶ 6).  Additionally, as Howard readily admits, the preamble to the Termination Agreement expressly acknowledges that Howard's options were granted "pursuant to the Company's 2003 Stock Incentive Plan."  Termination Agreement at 1 (Bayer Decl., ¶ 6); *see also* Opp. Br. at 2.[2]

Even assuming *arguendo* that the parties' intent cannot be gleaned from the four corners of the Termination Agreement such that a review of extraneous evidence is justified, Howard never disputes, and therefore admits, that he understood perfectly well that the Stock Option Agreement and the Plan existed and continued to govern the exercise of his stock options from and after the date the parties signed the Termination Agreement, and were clearly not superseded by the Termination Agreement.  Howard first communicated his intent to exercise his stock options in an email dated October 9, 2007, ***more than two and a half months after he signed the Termination Agreement***.  Countercl., Ex. 5 at 5–6 (Bayer Decl., ¶ 8).  In that request, and in direct conflict with his current assertion that the Stock Option Agreement was no longer in effect, Howard:

- acknowledged the exercise price of $0.50 per share, which is the same exercise price fixed by the Stock Option Agreement; and

- requested a copy of "Exhibit A to the [] Stock Option Agreement," which was the specific Notice that he was required to use under the Stock Option Agreement.  *Id.*

---

[2]      To the extent Howard's Opposition could be read as implying that the absence of any specific reference to the Plan in section 1 somehow proves that the parties intended to cancel the Stock Option Agreement and/or the Plan, that implication, even if it can be made, fails as a matter of law.  *See* Opp. Br. at 2–3.  Not only is it nonsensical to suggest that, by extending the deadline for exercising his stock options, the Termination Agreement somehow nullified the Stock Option Agreement and the Plan that granted Howard those options in the first place, but this is precisely the sort of tortured analysis of an isolated contractual provision that courts consistently reject.  *See SVS, Inc.*, 1991 U.S. Dist. LEXIS 18199, at *19.

Then, in an October 12, 2007 email, Howard conceded that he was "under the impression that there was something that I had to fill out along with a check" to exercise his options. Countercl., Ex. 5 at 4–5.  This again referred to the two items Howard was required to deliver under the Stock Option Agreement that he now says no longer existed at this time: (i) a signed Notice form, together with (ii) a check for the full exercise price.  And, most importantly, the Notice form Howard actually signed on October 30, 2007, after he now claims that the Stock Option Agreement and the Plan no longer existed, expressly acknowledges that Howard is "the holder of a Nonstatutory Stock Option granted to me ***under the Company's 2003 Stock Incentive Plan***" for the exact number of shares (108,000) and for the exact price ($0.50 per share) specified in the Stock Option Agreement.  Countercl., Ex. 2 at 1 (Bayer Decl., ¶ 7) (emphasis added).  Under these undisputed facts, there can be no dispute that Howard understood perfectly well that the Stock Option Agreement and the Plan remained in effect after he signed the Termination Agreement, and that he needed to comply with the provisions of those instruments to validly exercise his options.

### C.      Howard Has Failed to Plead a Legally Sufficient Claim for Breach of The Stock Option Agreement

Howard never disputes that, to survive this Rule 12(c) motion, he is required to plead legally sufficient facts to show that he effected a valid and timely acceptance of Intercept's offer to sell him 108,000 shares at a price of $0.50 per share by complying with the terms and conditions prescribed for the exercise of his stock options.  *See generally* Opening Br. at 8–11. Thus, consistent with the terms of the Stock Option Agreement (which, as explained above is what governed the exercise of Howard's stock options), Howard is required to plead that Intercept received (among other things) payment in full for the exercise price of his stock options at its offices by 5:00 p.m. on December 31, 2007.  *See id.* at 10–11.  Howard claims he met this

burden, and that, in any event, the requirements for exercising his stock options were sufficiently ambiguous that he is entitled to discovery on his claims.  Howard's arguments fail as a matter of law.

First, any allegation by Howard that "Intercept had received his $54,000.00 check sent by First Class Mail" on December 26, 2007, Opp. Br. at 6, should be disregarded for purposes of this Motion.  As Howard admits, this allegation is not an allegation of fact but rather Howard's *opinion* about what he *thinks* happened to the $54,000 check that he allegedly mailed to Intercept.  *See id.* (citing Howard Answer ¶ 16) ("Howard mailed the check . . . and was never informed by Intercept, prior to January 2014, that Intercept had either received the check later or had not received it at all, ***and Howard therefore alleges*** that it <u>was</u> received by Intercept.") (emphasis added).  This is precisely the sort of speculative and conclusory allegation that the Court should disregard on a motion for judgment on the pleadings.  *See Ennocenti v. Unisys Tech. Servs., LLC*, No. 12-CV-6367, 2012 U.S. Dist. LEXIS 159763, at *4 (W.D.N.Y. Nov. 7, 2012) ("[T]he court may disregard a plaintiff's "legal conclusions, deductions or opinions couched as factual allegations") (quoting *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)).  Once properly disregarded, Howard's remaining allegations are not legally sufficient to "nudge[] [his] claims across the line from conceivable to plausible," and his Counterclaim should therefore be dismissed.  *Oram v. SoulCycle LLC*, No. 13 Civ. 2976, 2013 U.S. Dist. LEXIS 154438, at *13 (S.D.N.Y. Oct. 28, 2013); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'''") (*citing Bell Atl.Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

Second, Howard's attempts to get past this Rule 12(c) motion by attempting to manufacture ambiguity in the Termination Agreement are unavailing.  For example, Howard's assertion that the absence of language in the "Description of Severance Benefits" section of the Termination Agreement that he needed to exercise his options "as provided for by the plans" falls far short of creating ambiguity in an otherwise unambiguous contract.  Opp. Br. at 7; *see also Int'l Klafter Co. v. Cont'l Cas. Co.,* 869 F.2d 96, 100 (2d Cir. 1989) ("the court must look to 'all corners of the document' rather than view sentences or clauses in isolation").  As explained above, both the Termination Agreement's plain terms and the undisputed contemporaneous emails demonstrate that the parties intended for the Stock Option Agreement's exercise requirements to survive the execution of the Termination Agreement.

Third, Howard's attempts to create ambiguity by pointing to communications outside the four corners of the parties' agreements fail as a matter of law.  *See* Opp. Br. at 7–8.  "The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable."  *Metro. Life Ins. Co.,* 906 F.2d at 889.  Here, there is no dispute that the Stock Option Agreement unambiguously required Howard to ensure that Intercept received, by the specified deadline, both a signed Notice and payment in full for the exercise of his options.  Thus, if the Court finds, as it should, that the Stock Option Agreement remained in effect at the time Howard allegedly attempted to exercise his options, it cannot and should not look to the White or Pruzanski emails, as argued by Howard, to alter those requirements.

However, even if the Court looks beyond the four corners of the Termination Agreement and considers the emails relied on by Howard as extrinsic evidence, Howard's assertions about

what one *could* read into them is pure speculation, and should be disregarded in light of their plain language.  Both Pruzanski's October 21, 2007 email and White's December 27, 2007 email clearly urged Howard to ensure that Intercept received the required payment before the end of December 2007.  *See* Countercl., Ex. 5 at 3 (Pruzanski: "send us an email saying *you'll get us the payment before the end of the year*") (emphasis added); Countercl., Ex. 6 (Bayer Decl., ¶ 9) (White: "*I believe we should be in receipt of [the check] by 12/31*") (emphasis added).  Moreover, Howard selectively ignores other undisputed emails attached to the pleadings, including Pruzanski's December 27, 2007 email, which reminded Howard "to get payment in for your stock options for the end of the year."  Countercl., Ex. 6 at 3 (Bayer Decl., ¶ 9).

Fourth, Howard's argument that White's December 21, 2007 email inquiring about whether Howard intended to mail his check somehow excused his obligation to ensure that Intercept actually received payment is wrong as a matter of law.  Pursuant to the unambiguous terms of the Stock Option Agreement, Howard could have chosen any means to deliver the payment to Intercept he liked, provided that Intercept actually received the check by December 31, 2007.  *See* Stock Option Agreement § 3(a) (Bayer Decl., ¶ 3); *See United States ex rel. B & R, Inc. v. Donald Lane Constr.,* 19 F. Supp. 2d 217, 225 (D. Del. 1998) ("An offeror can always so word his offer and so limit the power of acceptance as to make the receipt of the acceptance necessary to the creation of a contract.") (quoting CORBIN ON CONTRACTS § 78, at 339–340 (1963)); *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 786, 789 (S.D.N.Y. 1990) ("The offeror … is 'master of his offer' and may therefore make its acceptance (and thereby, the parties' final agreement) conditional upon return or receipt of the signed contract.") (citing *Williston on Contracts*, § 88 (3d ed. 1957)).

Lastly, any attempt by Howard to avail himself of the "dispatch rule" is misplaced. Howard's main argument is that New York law would "likely" apply the dispatch rule to options contracts. *See* Opp. Br. at 8. However, the *ninety* year old case on which he relies, *Shubert Theatrical Co. v. Rath*, 271 F. 827 (2d Cir. 1921) is easily distinguished because: (1) it does not apply to the Stock Option Agreement, which is undisputedly governed by Delaware law;[3] (2) it is contrary to the modern, black-letter understanding that the dispatch rule does not apply to option contracts,[4] and (3) it did not involve a contract that, like the Stock Option Agreement, expressly required that Howard's payment be "received by [Intercept] at its principal office" by the specified deadline. Stock Option Agreement § 3(a) (Bayer Decl., ¶ 3); *see also Union Oil Co. v. Mobil Pipeline Co.*, No. 19395-N, 2006 Del. Ch. LEXIS 213, at *49 n.61 (Del. Ch. Dec. 15, 2006) ("When the optionee decides to exercise his option, he must act unconditionally and according to the terms of the option"); *Tauber v. Bankers Trust Co.,* 230 A.D.2d 312, 319 (N.Y. App. Div. 1997) ("The law is clear that when a person accepts an option he or she is required to perform in accordance with the terms of the option agreement.").

Howard's assertion that whether the dispatch rule applies necessarily turns on questions of fact is wrong. First, the Stock Option Agreement is unambiguous that ***receipt*** by Intercept is required, and the Court should therefore not consider extrinsic evidence of the parties' intent. *See Metro. Life Ins. Co.,* 906 F.2d at 889. Moreover, the Yoon email Howard cites in an attempt to create ambiguity where none exists is of no help to Howard because it expressly states that no such payment was received by the December 31, 2007 deadline. *See* Countercl., Ex. 4 at 1

---

[3]      *See supra* note 2.

[4]      *See* Restatement Second, of Contracts § 63(b) ("Unless the offer provides otherwise, . . . an acceptance under an option contract is not operative until received by the offeror."); *see also AJW Partners, LLC v. Peak Entm't Holdings, Inc.*, 11 Misc. 3d 1054(A) (N.Y. Sup. Ct. 2006) (citing Restatement § 63(b) with approval).

(Bayer Decl., ¶ 12).  Howard cannot rescue an otherwise insufficient legal claim, and therefore burden Intercept with expensive and burdensome discovery, based simply on his speculation about what *might* have happened after he allegedly put his check in the mail.  *See Raeman v. County of Ont.*, No. 12-CV-6009 CJS, 2013 U.S. Dist. LEXIS 35008, *15 (W.D.N.Y. Mar. 11, 2013) (quoting *Contemporary Mission v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981)) ("plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint, and amplifying them only with speculation about what discovery might uncover.").  Under the Stock Option Agreement, Howard assumed the risk that whatever means of delivery he used might not reach Intercept by the December 31, 2007 deadline, and he therefore bears the burden of pleading *facts* showing that Intercept timely received the required payment.  He could easily have met this burden by, for instance, obtaining a return receipt for the check he allegedly mailed, or by delivering the check to Intercept in person since he admittedly lived "around the corner" from Intercept's offices, but he did not do so.  His inability to adequately allege timely receipt of the required payment by Intercept is fatal to his claim.

## II.    HOWARD'S COUNTERCLAIM IS BARRED BY THE STATUTE OF LIMITATIONS

Howard does not dispute that his breach of contract claim accrued, if at all, at the time of breach, regardless of whether he was aware of the breach when it occurred.  *See* Opp. Br. at 9–10.  But in an attempt to avoid New York's six-year statute of limitations, Howard argues that his claim accrued in January 2014, when Intercept refused to deliver stock certificates to his wife some 6 ½ years after Howard claims to have exercised his options.  *See* Opp. Br. at 9.  This argument is based on the flawed legal assumption that Intercept's refusal to deliver the stock

certificates constituted the first breaching event after Howard allegedly exercised his stock options.

Howard never disputes that the emails White and Pruzanski sent him on December 27, 2007 clearly show that Intercept did not recognize him as a shareholder as of that date. *See* Opening Br. at 13.  Instead, he claims that those communications did not constitute "notice" for purposes of the statute of limitations because they were sent one day after Howard allegedly mailed the required payment,[5] and Howard was entitled to assume that Intercept had not yet received the check. *See* Opp. Br. at 12.  But Howard cannot have it both ways.  If, as he claims, his acceptance of the stock option was effective upon mailing the alleged payment, then he became an Intercept shareholder as of December 26, 2007, and the December 27 emails breach the parties' agreements by failing to recognize his shareholder status.  If, however, the mere mailing of the check was not a sufficient exercise of the option, then Howard has not adequately pleaded receipt of the payment by Intercept, and his Counterclaim should be dismissed.

Neither *Hermanowski v. Acton Corp.*, 729 F.2d 921 (2d Cir. 1984) nor *Maxim Group LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293 (S.D.N.Y. 2010), upon which Howard relies, saves Howard's Counterclaim from dismissal as a matter of law.  First, both cases were decided under New York law rather than Delaware law, which governs the Stock Option Agreement and the Plan.  Also, the optionees in both of these cases, unlike Howard here, had undisputedly exercised their options and made the required payments in a timely fashion. *See Hermanowski*, 729 F.2d at 922 (noting that Hermanowski exercised his option by "tendering a bank check for $10,000," which the company promptly returned to Hermanowski); *Maxim*

---

[5]     Howard's assertion that the purported check carbon attached at Exhibit 3 to his Answer and Counterclaim somehow proves that he timely mailed a check for the exercise price to Intercept is illogical. *See* Opp. Br. at 11. Even if one assumes that Exhibit 3 is in fact a check carbon, the most it could show is that such a check was written—not that Howard ever mailed it or that Intercept ever received it.

*Group*, 690 F. Supp. 2d at 297 ("After the Agreement was executed, LPHI paid Maxim the $25,000 fee").  And, in both cases, the defendant's refusal to deliver shares was the first event after the options were exercised that suggested that the optionees were not valid shareholders. *See Hermanowski*, 729 F.2d at 922 (Hermanowski exercised options in September 1979 and delivery of shares was refused in November 1979); *Maxim Group*, 690 F. Supp. 2d at 298 (Maxim exercised options on September 6, 2007 and delivery of shares was refused on September 11, 2007).  Here, in contrast, Howard waited *more than six years* between the time he allegedly exercised his options and the time he demanded delivery of his shares, completely ignoring contemporaneous emails denying his shareholder status and initial and follow-on public offerings of Intercept's stock in the process.  Indeed, Howard is in the same situation as the plaintiff in *Eluv Holdings (BVI) Ltd. v. Dotomi, LLC*, No. 6894-VCP, 2013 WL 1200273 (Del. Ch. Mar. 26, 2013), where the Court had no difficulty dismissing his counterclaim as barred by the statute of limitations.[6]  *See* Opening Br. at 12–14.

Howard's attempt to rely on the purported "disclaimer" in the Notice, which stated that the shares subject to his option were restricted securities, as justification for his prolonged inaction fails.  *See* Opp. Br. at 11–12.  That "disclaimer" merely reminded Howard that he could not sell, transfer or otherwise dispose of the shares he purportedly owned pursuant to Rule 144 under the Securities Act of 1933 (the "Securities Act") until those shares were registered under the Securities Act.  *See generally* the Notice (Bayer Decl., ¶ 7).  It said nothing to suggest that "there would be a substantial and indefinite time period before the shares [Howard] purchased

---

[6]      Howard's attempts to distinguish *Eluv* miss the mark.  The difference in the limitations period under New York and Delaware law (*i.e.*, 6 years vs. 3 years) has no bearing on the question of when that limitations period began to run.  *See* Opp. Br. at 11.  Nor does the fact that *Eluv* was decided on a motion for summary judgment rather than at the motion to dismiss stage.  Moreover, the fact that the *Eluv* plaintiff's attempts to exercise his options were not successful is similar to, not distinguished from, the case at bar.

would be available to him." Opp. Br. at 12.  Indeed, consistent with SEC rules, companies routinely issue restricted stock certificates to holders of unregistered shares to memorialize their stock ownership.[7]  That Howard never received such certificates is yet another fact that put him on notice that Intercept did not consider him a valid shareholder.

Finally, Howard's attempt to invoke equitable tolling fails due to his own failure to follow up in any way to confirm Intercept's receipt of the check he allegedly mailed for more than six years.  *See Netzer v. Continuity Graphic Assocs.*, 963 F. Supp. 1308, 1316 (S.D.N.Y. 1997) ("A plaintiff seeking to invoke [equitable tolling] is also required to demonstrate that his ignorance is not attributable to a lack of diligence on his part."); *Smith v. Mattia*, No. 4498-VCN, 2010 WL 412030, at *4 (Del. Ch. Feb. 1, 2010) (equitable tolling "rests on the premise that the statute of limitations should be tolled where the facts underlying a claim were so hidden that they could not have been discovered by a reasonable plaintiff.").  As the court in *Eluv Holdings* recognized, "[a] one sentence email insisting that [Intercept] confirm that [Howard] validly had exercised the Option and was considered a shareholder likely would have been effectual, especially coupled with a reasonable degree of follow up."  2013 WL 1200273, at *12. Howard's failure to conduct even this minimal inquiry, particularly in light of numerous emails disputing his stockholder status and the fact that he never received the canceled $54,000 check he purportedly mailed, therefore precludes any equitable tolling.

---

[7]     *See* Rule 144: Selling Restricted and Control Securities, *available at* https://www.sec.gov/investor/pubs/ rule144.htm (last accessed June 23, 2014) ("***If you acquire restrictive securities, you almost always will receive a certificate stamped with a "restrictive" legend***. The legend indicates that the securities may not be resold in the marketplace unless they are registered with the SEC or are exempt from the registration requirements.") (emphasis added).

### III.   HOWARD'S CLAIM FOR DECLARATORY RELIEF IS REDUNDANT AND BARRED BY LACHES

#### A.   Howard's Claim for Declaratory Relief Should Be Dismissed As Redundant With His Breach of Contract Claim

In his Opposition, Howard admits that his claim for declaratory relief "ultimately may prove to be identical to" his breach of contract claim.  Opp. Br. at 15.  Yet he makes no attempt to explain what this redundant claim adds to the case, or what useful purpose would be served by permitting him to maintain it.  This failure is unsurprising because his claim adds nothing to the legal issues before the Court (which issues should be rejected as a matter of law), and should therefore be dismissed.  *See, e.g.,* Opening Br. at 14–15 (and cases cited); *Horowitz v. Am. Int'l Group, Inc.,* No. 09-Civ-7312 (PAC), 2010 U.S. Dist. LEXIS 103489, at *32–33 (S.D.N.Y. Sept. 30, 2010) (dismissing declaratory judgment claim as redundant with breach of contract claim).

Howard's reliance on *Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*, No. 06 Civ. 4626, 2008 U.S. Dist. LEXIS 35319 (S.D.N.Y. April 30, 2008) misses the mark completely because it involved a declaratory judgment counterclaim brought by an insurer.  The courts typically permit such counterclaims, even if redundant, because they have a useful purpose— they provide an opportunity for the court to interpret coverage provisions that could affect the rights of other insurance customers.  *See id.* at *21–22 ("In declaratory judgment actions **brought by insurers**, courts in this district routinely allow **an insured** to assert counterclaims for declaratory judgment or breach of contract.") (emphasis added).  No such useful purpose exists here.

#### B.   Howard's Claim for Declaratory Relief is Barred by Laches

Howard never disputes that the statute of limitations to the common law claim most analogous to his declaratory judgment claim is New York's six-year statute of limitations for contract actions.  Thus, if the Court finds, as it should, that Howard's breach of contract claim is

untimely, prejudice to Intercept is presumed, and his declaratory judgment action is barred by laches as a matter of law.  *See Phillips v. The Hellenic*, 179 F. Supp. 5, 7 (S.D.N.Y. 1959).

Howard's attempt to recast his lack of diligence as a reasonable investment decision in order to avoid laches falls short.  Howard's decision to sell his putative shares at a high price point is not what dooms his claim.  Rather, it is Howard's willful blindness to numerous indications that Intercept did not consider him to be a valid shareholder over an extended period of time that demonstrates a lack of diligence sufficient to invoke laches.  Not only did he choose to ignore the 5:00 p.m. on December 31, 2007 deadline for payment explicitly set forth in the Termination Agreement, he also ignored the White and Pruzanski December 27, 2007 emails reminding him to make payment no later than the deadline to which Howard had agreed. Incredibly, he did not follow up with Intercept even once to confirm Intercept's receipt of the check Howard now claims that he mailed, or to inquire about his restricted stock certificate representing the shares of common stock underlying his option.  Even more incredibly, he admittedly failed to make any inquiry whatsoever of Intercept even after the amount of $54,000—which was the amount of the check that Howard claims was written to Intercept— remained available in his bank account and was never confirmed by the receipt of a cancelled check.  And, Howard also remained oblivious to Intercept's initial public offering in October 2012 and a follow-up public offering in June 2013, both of which would have significantly affected the rights of all legitimate shareholders.  Through all this activity, Howard never once spoke up or inquired about how these events might affect his rights as a purported shareholder. Howard's failure to perform even the most basic follow up is inexcusable as a matter of law, and his claim for declaratory relief after years of sitting on his rights is therefore barred by laches.

## CONCLUSION

For the reasons set forth above, Intercept respectfully requests that the Court grant its Motion for Judgment on the Pleadings, dismiss Howard's Counterclaim, and enter judgment in Intercept's favor on its declaratory judgment claim.

Dated:  June 30, 2014                                     Respectfully submitted,


                                              /s/ Robert D. Cultice
                                              Sanket J. Bulsara
                                              WILMER CUTLER PICKERING
                                                   HALE AND DORR LLP
                                              7 World Trade Center
                                              250 Greenwich Street
                                              New York, NY 10007
                                              Telephone:  (212) 230-8800
                                              Fax:  (212) 230-8888
                                              Email:  sanket.bulsara@wilmerhale.com

                                              Robert D. Cultice (admitted *pro hac vice*)
                                              Michael J. Bayer (admitted *pro hac vice*)
                                              WILMER CUTLER PICKERING
                                                   HALE AND DORR LLP
                                              60 State Street
                                              Boston, MA 02109
                                              Telephone:  (617) 526-6000
                                              Fax:  (617) 526-5000
                                              Email: robert.cultice@wilmerhale.com
                                                        michael.bayer@wilmerhale.com

                                              ***Attorneys for Intercept Pharmaceuticals, Inc.***